# EXHIBIT B

# PART 2 OF 2

fringement, the patent holder must show the impact of such higher prices on the units demanded in the marketplace.

Another case illustrating the importance of industry analysis in price erosion litigation is *Erics-son, Inc. v. Harris Corporation.*[123] Ericsson (the patent owner) had contended that it was entitled to "lost profits due to lost sales" and "lost profits due to price erosion." To prove lost profits due to lost sales, Ericsson divided the market between the broader "Harris market" and the narrower "Ericsson market." The Harris market included customers that designed the infringing Harris product into their products. But these Harris customers may not have designed the Ericsson pat-ented product into their products, meaning that Harris had actually expanded the market. The nar-rower Ericsson market was limited to customers that had designed the Ericsson patented product into their products. The court upheld this market segmentation, finding that "Ericsson's market definitions and allocations were supported by substantial and economically sound evidence."[124]

To prove lost profits due to price erosion, Ericsson sought to identify factors that precluded com-petition, including costs to redesign the competing devices as well as the contested patent itself. Ericsson also contended that the uniqueness of the market would have enabled it to increase vol-umes at a higher price. The court acknowledged that Ericsson had "presented evidence of the high switching costs associated with redesigning a line card, the relatively low costs of SLICs, . . . [and] substantial evidence of the similarities between the two products and their markets."[125]

The *Crystal Semiconductor* and *Ericsson* decisions demonstrate two important principles that should be addressed in analyzing price erosion claims, namely (1) the possibility that the in-fringer has expanded the market over what it would have been but for the infringement; and (2) the care that should be used in attempting to identify benchmarks.

### 2.3.2.4. Considerations in the Calculation of Price Erosion

In a price erosion calculation, several factors should be examined for their potential effect on the non-infringed price. These include the price elasticity of the intellectual property owner's prod-uct that competes with the infringing product, and other factors that may influence the prices of the two competing products.

### 2.3.2.5. Price Elasticity

The price elasticity of supply and demand is often central to the calculation of damages based on alleged price erosion. The price elasticity of demand measures the sensitivity of the quantity de-manded to price changes of the product.[126] Under basic economic principles of supply and de-

---

[123] *Ericsson, Inc. v. Harris Corp.,* 352 F. 3d 1369 (Fed. Cir. 2003).

[124] Ibid., 352 F. 3d 1369 (Fed. Cir. 2003).

[125] Ibid.

[126] Pindyck, R. & Rubinfeld, D. *Microeconomics,* Fifth Edition. Prentice Hall, Upper Saddle River, New Jersey, p. 30, 1998.

mand, an increase in the price of a product usually results in a decrease in the amount of the product demanded.[127] Conversely, a decrease in price usually results in an increase in the quantity demanded. A product's price elasticity of demand is the percentage change in quantity demanded divided by the percentage change in price.[128] In other words, elasticity reveals how much the quantity demanded for a product varies with a change in price.

The interrelationship between price elasticity and price erosion is apparent in *3M vs. Johnson and Johnson*. In that case, the Special Master ruled that the "vigorous price competition" between 3M and Johnson & Johnson had caused a reduction in the price of the infringed product during the infringement period, and that absent the competition, 3M would have been able to raise the price of the product. However, the court found that 3M would have contracted the size of the market as a result of the price increases.[129]

In its *Crystal Semiconductor v. TriTech* decision, the court addressed the law of demand and price elasticity, quoting the following excerpt from Paul Samuelson's text, *Economics* (eleventh edition, 1980, pp. 53-55):

> According to the law of demand, consumers will almost always purchase fewer units of a product at a higher price than at a lower price, possibly substituting other products. For example, if substitution of a product was impossible and the product was a necessity, elasticity of demand would be zero—meaning consumers would purchase the product at identical rates even when the price increases. This very rare type of market is called inelastic. On the other side of the spectrum, if any price increase would eradicate demand, elasticity of demand would be infinite—meaning consumers would decline to purchase another single product if the price increases by any amount. This very rare type of market is called perfectly elastic.[130]

The analyst can use a variety of tools from both statistics and economics to determine the price elasticity of demand for a product.

### 2.3.2.6. Market Analysis of Infringing Product

An examination of the market that the plaintiff's product serves is required to assess the merits of a price erosion claim. The number of competitors in a given market influences the prices established in that market, with price erosion easier to measure in two-supplier markets than in multi-supplier markets. However, an intellectual property owner cannot assume that it would capture the entire market absent the infringement simply because it operates in a two-supplier market. Further, market size can be affected by a number of issues. For example, the defendant may con-

---

[127] Ibid., p. 30.

[128] Ibid., p. 30.

[129] *3M vs. Johnson and Johnson,* 976 F.2d 1559, 1579 (Fed. Cir. 1992).

[130] *Crystal Semiconductor vs. TriTech,* 246 F. 3d 1336, 1359 (Fed. Cir. 2001). In *Crystal,* the Federal Circuit indicated that the "patentee's price erosion theory must account for the nature, or definition, of the market . . . and the effect of the hypothetical increased price on the likely number of sales at that price in the market."

tend that it had expanded the market by entering it with a lower-priced infringing product, negating any price erosion claim.[131]

The intellectual property owner also cannot assume that the infringer would be absent from the market absent the infringement, especially if the infringer sells multiple products, only one of which infringes. In such a case, the infringer may affect the size of the market through (1) discounting similar model products, (2) adding features to existing products to entice customers, or (3) designing around the patent and offering a new product.

In a market in which the intellectual property holder and infringer are two competitors among many, price erosion may be much more difficult to prove and/or measure. In a market with a large number of competing products, price is much less influenced by the actions of a single competitor; rather, the entire market acts to set the price. As more and more firms compete in a market, each may find it harder to raise prices and avoid losing sales to other firms.[132]

Price erosion may also be claimed on products that are serving two different markets. Identifying differences in the markets served by the infringing product and the intellectual property owner's product can reveal the factors that influence price in each of those markets.

### 2.3.2.7. Substitutes and New Product Entrants

Potential substitutes for the infringed product from its own segment and competing industries should be examined with regards to price erosion. Substitutes that limit the potential returns of an industry by placing a ceiling on the prices that firms in that industry can profitably charge[133] can diminish or invalidate a price erosion claim.

The threat of new entrants into the infringed product's industry should also be examined. "New entrants to an industry bring new capacity, the desire to gain market share and often substantial resources. Prices can be bid down or incumbents' costs inflated as a result, reducing profitability."[134] The likelihood of new entrants into an industry which may have an effect on the price for an infringed product should be considered in assessing potential price erosion. Conversely, barriers to entry into an industry or a market may simplify an argument for price erosion.

### 2.3.2.8. Power of Suppliers and Buyers

Suppliers and buyers may influence the price of an infringed product. With respect to buyers, factors that may influence price include (1) the percentage of total sales an individual buyer

---

[131] *Litigation Services Handbook*, Third Edition. Edited by R. Weil, M. Wagner, and P. Frank. New York: John Wiley and Sons, Inc., p. 30, 2001.

[132] Pindyck, R & Rubinfeld, D. *Microeconomics,* Fifth Edition. Upper Saddle River, NJ: Prentice Hall, p. 345, 1998.

[133] M. Porter. *Competitive Strategy*. New York: Macmillan Publishing, p.23, 1980.

[134] Ibid., p. 7.



represents to a seller, and (2) the ability of buyers to easily switch to another product.[135] If buyers of the product which suffered price erosion have significant market power, their impact on the market and price of the infringed product should be considered; the lower price may have come from buyer power, not additional competition. Similarly, the power of suppliers in the creation of the infringed product should be examined.[136]

The switching costs of the buyer should also be considered. If the buyer's costs of switching from the patented technology to a different technology are significant, the intellectual property holder may have a captive market and prices could be substantially increased without affecting demand.

### 2.3.2.9. *Entire Market Value Rule*

Lost revenues in intellectual property disputes may be calculated based on the selling price of the component of a system that is covered by the intellectual property in suit, or, alternatively, the lost revenue may be that lost on the sale of the entire unit, product or system of which the component piece was a part. This latter approach is referred to as the *entire market value rule*, which allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is covered by the intellectual property-in-suit.[137] The entire market value rule ordinarily applies when the nonpatented and patented components are physically part of the same machine, as in the *Rite-Hite Corp. v. Kelley Co.* case.[138] However, some courts have extended the rule's application to physically separate nonpatented components, so long as they are considered part of one complete machine or constitute a functional unit.[139]

The entire market value rule has been applied to both lost profits and a reasonable royalty, as well as to patent and other types of intellectual property disputes. The rule recognizes that, in some cases, the economic value of intellectual property may be greater than the value of the sales of the covered part alone.[140] Essentially, the entire market value rule applies if the patent holder would have sold the complete device (rather than just the patented component) if there had been no infringement.

---

[135] Ibid., p. 25.

[136] M. Porter. *Competitive Strategy*. New York: Macmillan Publishing, p.28, 1980.

[137] *Lessona Corp. v. U. S.*, 599 F.2d 958, 974 (Ct. Cl. 1981).

[138] *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995).

[139] Ibid; *see also, Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1485 (Fed. Cir. 1990) (affirming an award of damages for filter screens used with a patented filtering device); *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986) (affirming award of damages for nonpatented wheels and axles sold with patented vehicle suspension); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656 (Fed. Cir. 1985) (affirming an award of damages for nonpatented uppers of an improved amphibious vehicle having a patented pontoon structure).

[140] *Brunswick v. United States*, 36 Fed. Cl. 204 (Fed. Cir. 1996), *aff'd*, 182 F.3d 946 (Fed. Cir. 1998); *see also, Gargoyles, Inc. v. United States*, 37 Fed. Cl. 95 (Fed. Cir. 1997) (using the Entire Market Value Rule to calculate the royalty base), *aff'd*, 113 F.3d 1572 (Fed. Cir. 1997); *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 908 (1997). *But see, In re Dahlgren Int'l, Inc.*, 811 F. Supp. 1180 (N.D. Texas 1992) (calculating a royalty base without including nonpatented goods or services, even though lost profit calculations account for such items).

For example, in *King Instruments Corp. v. Perego,* the Federal Circuit awarded the patent holder lost profits on sales made by the infringer of nonpatented parts for a video tape splicing machine that used the patented invention.[141] Similarly, in *State Indus., Inc. v. Mor-Flo Indus., Inc.*, the Federal Circuit awarded damages based on the patent holder's profit margin on the sales of an entire water-heating unit. This case concerned the infringement of a patented method for adding foam insulation to the water heaters during the manufacturing process.[142]

In contrast, in *Hughes Aircraft Co. v. United States*, the Federal Circuit declined to award damages based upon the entire market value rule. Hughes argued that the government had infringed its patent controlling the altitude of a spacecraft and that the damage award should include the value of the patented device plus the value of the payload. The payload was the non-infringing satellite that was attached to the spacecraft with the patented device. The court, however, found that Hughes could not reasonably have anticipated the sale of the satellite if it had been granted the contract to build the infringing spacecraft.[143] As the satellite and the spacecraft did not constitute a functional unit, application of the entire market value rule was unwarranted.

The entire market value rule may also apply to the determination of a reasonable royalty if the patented component is included in a larger device. In that context, the reasonable royalty rate may be applied to the sales of the larger device, not just the patented component. However, care should be taken to develop a royalty rate consistent with the underlying facts. If an analysis of comparable licenses suggests a royalty rate of, for example, five percent applied to sales of the patented component, it may be improper to conclude that the five percent should be applied to sales of the larger device containing the patented element. Rather, it may be appropriate to reduce the royalty rate to compensate for the increased royalty base.

### 2.3.2.10. Convoyed or Collateral Sales

Lost profits can be awarded for the lost sales of ancillary or accessory products (i.e., convoyed or collateral sales). Convoyed sales generally include sales of products not covered by the intellectual property in suit but that are caused by the sale or use of that intellectual property.

When determining whether a patent holder may recover damages for convoyed sales, the analyst should be careful to distinguish that issue from the application of the entire market value rule. The entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented.[144] In contrast,

---

[141] *King Instruments Corp. v. Perego*, 65 F.3d 941 (Fed. Cir. 1995) (Nies, J., *dissenting*), *rehearing denied, petition for rehearing en banc declined*, 72 F.3d 855 (Fed. Cir. 1995) (Nies, J., *dissenting*).

[142] *State Industries, Inc. v. Mor-Flo Industries, Inc.,* 883 F.2d 1573 (Fed. Cir. 1989).

[143] *Hughes Aircraft Co. v. U. S.,* 31 Fed. Cl. 464 (Fed. Cir. 1994).

[144] *Paper Converting Machine Co. v. Magna-Graphics Corp.,* 745 F.2d 11, 22 (Fed. Cir. 1984).

convoyed sales are of items that are not typically a physical part of the original device but which are sold as a result of the sale of the patented item.

The Federal Circuit has stated that "[t]he expression 'convoyed sales' should preferably be limited to sales made simultaneously with a basic item; the spare parts here should best be called 'derivative sales.'"[145] "[I]t is not the physical joinder or separation of the contested items that determine their inclusion in or exclusion from the compensation base for computing a royalty . . . so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question."[146]

Regardless of the terminology used, the test for damages remains the same. That is, the intellectual property holder may recover damages for convoyed sales if the intellectual property owner can prove that it would have made those sales "but for" the infringement.

Under the entire market value rule and convoyed sales doctrine, an intellectual property owner is not permitted to recover losses for products that are sold with the patented item merely for a business or marketing advantage. In *Rite-Hite*, the Federal Circuit stated that it would not extend liability "to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage."[147] Further, there should be a reasonable probability that the sale of the patented item would have caused the sale of the nonpatented accessory. But all facts and circumstances should be carefully analyzed. For example, in *King Instrument Corporation v. Otari Corporation*, the court stated that the "infringer had acquired implied license to sell unpatented repair parts through payment of damages as to past infringing machine sales and could not be enjoined from selling any spare parts."[148]

An intellectual property holder may recover damages for lost sales of services related to the patented invention. In *Ristvedt-Johnson, Inc. v. Brandt, Inc.*, the court awarded the patent holder lost profits on machine sales, repair services, preventive maintenance inspection agreements, and supplies. The plaintiff was able to demonstrate that the one-year maintenance agreements were normally purchased when a customer bought the patented coin sorter. However, the court restricted the award for the contracts to the period during which the infringement occurred.[149]

### 2.3.2.11. Lost Revenues in Copyright Cases

To perform a lost profits calculation in a copyright case, the copyright owner can (1) analyze sales for a period before the infringement and compare that to the sales subsequent to the in-

[145] *Carborundum Co. v. Molten Metal Equip. Innovations*, 72 F.3d 872, 881 n. 8 (Fed. Cir. 1995).

[146] *Leesona Corp. v. U.S.*, 599 F.2d 958, 974, *cert. denied*, 444 U.S. 991 (1979).

[147] *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995).

[148] *King Instrument Corporation v. Otari Corporation*, 814 F.2d 1560 (Fed. Cir. 1995)

[149] *Ristvedt-Johnson, Inc. v. Brandt, Inc.*, 805 F. Supp. 557, 565 (N.D. Ill. 1992)

fringement, or (2) use the infringer's sales as a base. These techniques are merely a means to an end, namely a determination of the magnitude of sales the copyright holder would have made absent the infringement.

If the infringing work and the copyrighted work compete at the same price in the same market, the infringer's sales may be used as a measure of sales lost by the copyright owner. Under this measure, the court will ordinarily multiply the copyright owner's profit on one sale by the number of sales made by the defendant to arrive at the copyright owner's actual damages. However, it is rare that the copyrighted work price and infringer's price are the same. Differences between the copyright owner and the infringer on matters such as pricing, packaging, advertising, efficiency, cost, production techniques, and goodwill may preclude use of the infringer's sales as a measure of the copyright owner's lost sales.[150] In essence, to justify a one-to-one substitution of the infringer's sales for the copyright owner's lost sales, the copyright owner should attempt to show that all of the infringer's customers would have bought the copyrighted work but for the availability of the infringing product.[151]

Even if the copyright owner is not able to use the infringer's sales as a measure of its own lost profits, the owner still may be able to recover the infringer's profits. For example, in *Stevens Linen Associates, Inc. v. Mastercraft Corp.*, the court allowed the copyright owner the choice between (1) lost profits based on all of defendant's sales made to customers which had purchased from the copyright owner in the past, or (2) lost profits determined by the percentage difference in sales of the infringed product compared with the percentage difference in sales of all other non-infringed products of the copyright owner.[152]

Courts will ordinarily reject projections made by copyright owners that cannot be supported by reasonably probable evidence.[153] However, courts may accept probable estimates in the form of opinion testimony. If the copyrighted product is sold at a price significantly higher than the defendant's infringing product, the courts are likely to assume that less than all of the defendant's sales were sales lost by the copyright owner, as the lower price likely caused at least some of the defendant's sales.

Although many courts have limited the copyright owner to the profits of the infringer as compensation for lost profits, other courts have found this remedy to be insufficient. In *F.W. Woolworth Co. v. Contemporary Arts*, the United States Supreme Court determined that "a rule of liability which merely takes away the profits from an infringement would offer little dis-

---

[150] *Mary Ellen Enterprises, Inc. v. Camex, Inc.*, 68 F.3d 1065, 1070 (Eighth Cir. 1995).

[151] Glick, M. A., Reymann, L. A. and Hoffman R. (2003). *Intellectual Property Damages: Guidelines and Analysis*. John Wiley & Sons, Inc. Hoboken, N. J.: p. 318, 2003.

[152] *Stevens Linen Associates, Inc. v. Mastercraft Corp.*, 656 F.2d 11 (Second Cir. 1981)

[153] Ibid., p. 15.

couragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy."[154]

In determining the copyright owner's lost profits, it is necessary to deduct the incremental overhead expenses that the copyright owner would have incurred if, in fact, those extra sales had been made.[155] If overhead expenses would not increase as a result of additional sales, there is no need to include overhead costs as a component of the damage measure.

### 2.3.3. Measuring Incremental Costs

As discussed previously, when calculating lost profits, the appropriate benefit stream to measure is the incremental profit margin. Determining incremental costs is challenging and often a significant source of contention. It is not unusual for the infringer to claim that the intellectual property owner would need to increase its costs proportionately with the production of additional units or additional revenues. These costs may include increased general and administrative costs or other nondirect product related costs. Increasing these types of costs would lower the profits on the infringing units, as well as the related damages. In response, the intellectual property owner often argues that (1) the gross margin more closely reflects incremental profitability, and (2) it would not have been necessary to add equipment, overhead, or infrastructure to produce and sell the infringed units. This position, of course, tends to increase profitability from the lost sales, as well as related damages. The truth could fall anywhere within the range of these two polar positions, depending on the specific facts and circumstances of the case.[156]

A careful examination of costs is essential to determining the profitability of the lost sales. An examination of each specific cost line item may be necessary. This effort often involves reviewing the costs reflected within detailed financial statements, standard accounting records, and other financial documents. In lieu of a determination by line item, a statistical analysis of the relationship between cost and volume may provide the required cost estimates. Such analysis can identify, on average, how much costs have in fact increased for each unit increase in sales volume.[157]

One of the initial determinations for each cost item is whether the cost is variable or fixed over the range of actual and anticipated incremental production. A comparison of the intellectual property owner's output to the claimed incremental sales can help determine the amount of incremental costs that would need to be incurred to make the incremental sales. For example, a doubling in sales may call for an investment in additional manufacturing facilities and manage-

---

[154] *F.W. Woolworth Co. v. Contemporary Arts,* 344 U.S. 228, 234 (1952).

[155] *Taylor v. Meirick,* 712 F.2d 1112, 1121 (Seventh Cir. 1983).

[156] Glick, A.G., Reymann, L.A. and Hoffman, R. *Intellectual Property Damages: Guidelines and Analysis.* John Wiley & Sons, Inc. Hoboken, N.J.: p. 147, 2003.

[157] "Cost Analysis," J. Kinrich, R. Mangum and A. Meister, in *Intellectual Property Damages, Guidelines and Analysis,* 2004 supplement, M. Glick, L. Reymann, and R. Hoffman, eds., Chapter 14a, New York: Wiley.

ment personnel, while an increase of only five percent of a plaintiff's sales may not require such an investment.

### 2.3.4. Fixed Costs

*Fixed costs* remain constant in total dollar amount as the level of sales activity changes.[158] These costs typically do not respond to changes in the volume of sales activity within (1) a set period of time, or (2) a set production level. Examples of fixed-cost items may include factory and manufacturing equipment and buildings, property taxes and certain insurance, charitable contributions, research and development, and depreciation.

Capacity is often an important issue when evaluating fixed costs. If a company has excess capacity, it may well have been able to produce and sell the infringed units with little, if any, additional fixed costs. Conversely, if the company is operating at or close to full capacity, then additional units of production may require additional investments in equipment or other typically fixed costs.

### 2.3.5. Variable Costs

*Variable costs* are those that change in direct proportion to changes in volume of activity. A variable cost is one in which the per-unit cost remains relatively constant as volume changes.[159] In other words, total variable costs vary as the level of unit sales changes. Although, in theory, variable costs are relatively constant as volume changes, this is not always true in economic reality. The analyst should closely examine variable costs that may increase or decrease as volume changes.

Direct materials and direct labor costs are usually variable costs, since the total of these expenses varies directly with the number of units produced. In addition, sales commissions may vary with total sales and, therefore, are typically variable. Other variable costs may include factory overhead items such as utilities, production supplies, and lubricants. Total variable costs change in direct proportion to changes in production volume, which equates to zero dollars when the activity level is zero.

### 2.3.6. Semi-Variable Costs or Mixed Costs

A number of costs have both fixed and variable characteristics.[160] *Semi-variable* or *mixed* costs are expenses that can be separated into fixed and variable components. The variable component increases or decreases with sales or production volume, while the fixed component does not vary. For example, sales personnel may be paid both a base salary and a commission based on

---

[158] P. E. Fess and C. S. Warren, *Accounting Principles*, Sixteenth Edition. Cincinnati, OH: South-Western Publishing Co., p. 810, 1990.

[159] Gray, J. and Ricketts, D. *Cost and Managerial Accounting*. New York: McGraw-Hill Book Co., p. 28, 1983.

[160] P. E. Fess and C. S. Warren, *Accounting Principles*, Sixteenth Edition. Cincinnati, OH: South-Western Publishing Co., p. 11, 1990.

sales. Although the base salary component represents a fixed cost, sales commissions fluctuate with the amount of sales and represent a variable cost.

Some costs are considered step variable costs. *Step variable costs* increase or decrease only in response to fairly wide changes in activity level. For example, the cost of an additional maintenance worker may represent a step-variable cost.

## 2.3.7. Cost of Goods Sold or Manufacturing Costs

*Cost of goods sold* refers to the costs of the manufactured products sold. Typically, these costs reflect the raw materials and manufacturing costs used to convert the raw materials into finished goods and can include such expenses as storage costs, import taxes, and shipping expenses.

## 2.3.8. Gross Profits

*Gross profits* refer to the excess of net sales revenue over the cost of goods sold. These profits are referred to as "gross" because the operating expenses have not been deducted. The gross profit margin is computed by dividing gross profits by net revenues.

## 2.3.9. Operating Expenses

*Operating expenses* include those expenses incurred in the buying, selling, and administrative functions of the business. These activities may be divided so that the selling expenses and the general and administrative expenses appear separately.

### 2.3.9.1. Selling and Marketing Expenses

*Selling and marketing expenses* are costs incurred to promote the sales of the product and generate revenues. These costs should be directly related to the sale of merchandise. Selling and marketing expenses include salaries for sales and marketing personnel, sales office expenses, travel funds, promotions, advertising, and other costs associated with the direct efforts aimed at getting products or services from the company to the consumer. These expenses may include marketing development costs associated with new products as well as existing products.

Expenses are often characterized as cost of goods sold, selling and marketing, and general and administrative. However, the character of the expenses depends on the nature of the industry. Fixed expenses in one industry or one business can be variable in another.

### 2.3.9.2. General and Administrative Expenses

*General and administrative expenses* include expenses associated with general expenditures on the administrative side of the business. These expenses can include accounting services, payroll



and human resources, management information services, cash management (accounts payable and accounts receivable), as well as other support activities. The costs of these services typically do not vary with the company's production output. However, the facts and circumstances in each case vary and need to be analyzed.

### 2.3.9.3. Incremental Profit Margin

The calculation of the incremental profit margin requires a determination of which costs are fixed and which costs are variable over a known increase to various levels of sales volume. In general, firms with historically high variable and low fixed costs (such as consulting firms) will have lower incremental profits relative to firms with historically low variable costs and high fixed costs (such as software firms).

After assessing the historical movement of the cost relative to volume and considering the type of cost, the cost is classified as either fixed or variable. A review and analysis of the income statement may be necessary to obtain the incremental profit margin on additional units sold. Generally, an income statement categorizes costs into cost of goods sold, operating expenses, and general and administrative expenses. Income statement items that are often ignored in a damage calculation include gains or losses from discontinued operations, extraordinary income, and/or extraordinary expenses.[161] Generally, lost profits are calculated on a pretax basis.

To measure the incremental costs associated with the increased units sold, the courts have typically adopted two approaches, namely (1) account analysis, and (2) regression analysis. Account analysis "involves examining accounts at the general ledger level and determining whether that cost is fixed or variable."[162] Regression analysis "is a statistical technique for determining the relationship between two variables"[163] and is applied to cost and volume data. Before relying upon a regression analysis, the analyst should have a thorough understanding of regression modeling.

Although regression analysis can generate an unbiased estimate of, for example, the average cost incurred in manufacturing each unit, the quality or value of that estimate depends on the precision of the estimate. Regression analysis generates not only estimates of model parameters, but also estimates of the precision of the analysis, often referred to as the standard error. Standard tools of statistics allow a determination of whether a level of precision is acceptable, a condition referred to as statistical significance. The analyst should evaluate whether the results of a regression analysis are "statistically significant."

Courts have considered the relative reliability of account and regression analyses. For example, in *Micro Motion, Inc. v. Exac Corp.*, the court weighed the reliability of an account analysis against a

---

[161] M. A. Glick, L. A. Reymann, and R. Hoffman. *Intellectual Property Damages: Guidelines and Analysis,* Hoboken, NJ: John Wiley & Sons, Inc., pp.77-78, 2002.

[162] *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q.2d 1481, 1526 (N.D. Mass. 1990).

[163] Ibid.

regression and historical analysis in an effort to determine the costs that the patent holder would have incurred had it produced the units that were sold by the infringer.[164] The court determined that the regression analysis was of little probative value and declined to follow it, because it found that the regression analysis was more applicable to cases involving well-established firms with regular sales, not one that had substantial nonrecurring costs. Instead, the court adopted the account analysis that classified each cost as a variable, semivariable, or a fixed cost.[165]

In contrast, the court in *Polaroid Corp. v. Eastman Kodak Co.* rejected an account analysis in favor of a regression analysis.[166] The court found that the account analysis relied too heavily on the subjective assessments of the parties and was subject to undue bias.[167] The court also rejected the account analysis because it lacked supporting documentation, including an absence of working papers, notes, or the names of personnel contacted.[168] Additionally, the court found problematic that the account analysis was performed for only one year, although the infringement had occurred over multiple years.

In addition to the analyses discussed above, the expert analyzing costs should consider the following factors:

- When looking at costs of sales and individual line items over time as compared with unit production, care should be taken in analyzing the basis for inventory costing. That is, first-in, first-out; last-in, first-out; or average inventory costing may yield dramatically different results.

- Cost studies which provide information about what costs are specifically associated with the production or sale of units should be considered.

- Contracts can clarify what the commissions are on incremental unit sales or what the costs of materials are at various material purchase levels (for example, considering quantity discounts).

- Invoices showing purchases of inventories or materials, including those reflecting price increases, may help the expert ascertain what portion of cost increases were driven by changes in unit production or sales, as compared to other causes.

## 2.4. REASONABLE ROYALTY

Once infringement has been proven in patent cases, the patent holder is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty."[169]

---

[164] *Micro Motion, Inc. v. Exac Corp.*, 761 F. Supp. 1420, 1429 (N.D. Cal. 1991).

[165] Ibid., p. 1429. The account analysis was based on an individual review by the testifying expert of almost 6,000 accounts.

[166] *Polaroid Corp. v. Eastman Kodak Co.*, 16 USPQ 2d 1481 (N.D. Mass. 1990).

[167] Ibid., p. 1526.

[168] Ibid., p. 1527.

[169] 35 USC § 284.

In the event lost profit damages cannot be proven for all of the alleged infringing sales, then the patent owner is entitled to reasonable royalties from use of the patented technology for the remaining units sold by the infringer. In other words, the patent holder is entitled to some form of damages on all the infringing sales.

In nonpatent intellectual property disputes, reasonable royalty is neither the base case nor the minimum award. However, it remains an alternative measure of damage and is available under appropriate circumstances. For example, the UTSA (as amended in 1985) states that "[i]n lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."[170]

The case law on reasonable royalty for nonpatent intellectual property suits borrows from the more developed body of case law from patent disputes. As a result, the discussion below relating to the parameters and guidelines provided for reasonable royalties in the context of patent disputes is generally applicable to other types of intellectual property infringement, unless otherwise noted. Of course, in all intellectual property disputes the reasonable royalty to be paid to plaintiff by defendant is governed by the particular facts of the case.

A starting point in determining a reasonable royalty is an established royalty—that amount paid by the parties for the intellectual property in suit—as it is based upon the voluntary agreement of a licensor and a licensee. When an established royalty does not exist or cannot be proven in sufficient detail, the analyst may need to calculate a royalty that would result from a hypothetical negotiation between the parties. These alternatives are discussed in the sections below.

## 2.4.1. Established Royalty

To recover an award of damages based on an established royalty rate, the patent owner needs to show that a licensing agreement covering the patent was entered into with another party, typically prior to a lawsuit or threat of a lawsuit.[171] The patent holder may have to demonstrate that multiple parties have found the royalty rate to be reasonable.[172] Some courts have held that a single licensing agreement may be insufficient and unreliable to prove an established royalty rate.[173] In general, the analyst should consider whether the royalty rate was accepted by enough members in the industry to be considered reasonable. Additionally, the analyst should consider whether or not existing licenses are truly comparable to the dispute between the patent holder and infringer.

---

[170] Uniform Trade Secrets Act with 1985 Amendments, p. 11.

[171] *Sudiengesellschaft Kohle, m.b.h. v. Dart Indus.*, 862 F. 2d 1564, 1572 (Fed. Cir. 1988).

[172] *Trell v. Marlee Electronics Corp.*, 912 F. 2d 1443, 1446 (Fed. Cir. 1990).

[173] *Hanson v. Alpine Valley Ski Area*, 718 F. 2d 1075, 1078 (Fed. Cir. 1983); *Wang Laboratories, Inc. v. Mitsubishi Elec. America, Inc.*, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993).

In evaluating established or otherwise existing royalty rates for the purposes of determining the reasonable royalty that an infringer should pay the patent holder, it often appears appropriate to suggest royalty adjustments to account for inherent differences between the existing agreement and the hypothetical negotiation (for example, the certainty regarding infringement and validity, or the perceived threat of litigation). Although such differences may be real and suggest the need for an adjustment, the analyst should not fail to consider all the inherent differences between actual negotiations and hypothetical negotiations. For example, actual negotiations usually include the transfer of knowledge and know-how, as well as documentation and sometimes continued support. These items, often of substantial value, are normally not transferred to infringers. The analyst should use caution when deciding how to properly quantify the overall royalty adjustment.

## 2.4.2. Hypothetical Negotiation

A reasonable royalty analysis attempts to determine a royalty the patent owner would have obtained in an arm's-length "hypothetical negotiation" between the patent owner (as a willing licensor) and the infringer (as a willing licensee) just prior to the onset of infringement. This "hypothetical negotiation" analysis is inherently different from a "real-world" negotiation, in that it assumes that both parties agree the patent is valid and that the infringer's use of the technology is infringing. In light of the artificial nature of the hypothetical negotiation, a patent owner is not required to prove the reasonable royalty and its resulting damages with exact certainty but rather "as a matter of just and reasonable inference."[174] (In this regard, refer to Section 2.3.2.9., "Entire Market Value Rule.")

The hypothetical negotiation assumes that both parties would have been willing and able to negotiate a license agreement and that the negotiation took place at the time of first infringement. While the hypothetical negotiation is assumed to occur at the time of first infringement, it would be wrong to conclude that this timing should generally result in a "last minute premium" to be applied to the reasonable royalty.

It may appear that, like in a valuation, only information available as of the date of the supposed hypothetical negotiation could be used to determine the value of the royalty. However, despite the fact that the hypothetical negotiation should be as of the date of first infringement, the courts have considered information subsequent to the hypothetical negotiation date in determining the damage award.[175] This information is typically referred to as the "Book of Wisdom."

In deciding the reasonable royalty issues, the *Panduit* court addressed the following issues concerning the hypothetical negotiation:

---

[174] *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161 (Fed. Cir. 1991).

[175] *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988).

> The setting of a reasonable royalty after infringement cannot be treated, as it was here, as the equivalent of ordinary royalty negotiations among truly 'willing' patent owners and licensees. That view would constitute a pretense that the infringement never happened. It would also make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner. Except for the limited risk that the patent owner, over years of litigation, might meet the heavy burden of proving the four elements required for recovery of lost profits, the infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a 'heads-I-win, tails-you-lose' position.[176]

The analyst understands that in an actual negotiation between a willing buyer and a willing seller, neither party is required to undertake the transaction. However, in a hypothetical negotiation, both parties are required to consummate the transaction. Therefore, the hypothetical negotiation needs to consider the specific circumstances surrounding both parties, such as financial position, competitive strategies, and market position.

A seminal case for determining a reasonable royalty rate is *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, which identified 15 factors that need to be considered in a reasonable royalty rate calculation. These factors are discussed in the following sections.

### 2.4.2.1. Georgia-Pacific Factors

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*[177] provided a list of 15 factors that the court considered important in determining a reasonable royalty rate. These factors have been widely adopted by the courts for use in calculating a reasonable royalty rate in a patent case. Not all of the factors will be considered in each case, nor will they all have the same level of importance in each case. In discussing the 15 factors, the court indicated that ". . . there is no formula by which these factors can be rated precisely in the order of their relative importance or by which their economic significance can be automatically transduced into their pecuniary equivalent."[178]

The 15 *Georgia Pacific* factors are as follows:

1. The royalties received by the patent holder for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.

---

[176] *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1158 (Sixth Cir. 1978)

[177] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified,* 446 F.2d 295 (Second Cir. 1970), *cert. denied*, 404 U.S. 870 (1971).

[178] Ibid.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented item; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent, its commercial success, and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, which had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention, and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in a comparable business to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patent holder) and a licensee (such as the infringer) would have agreed upon if both had reasonably and voluntarily tried to reach an agreement; that is, the amount that a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and the amount that would have been acceptable by a prudent patent holder who was willing to grant a license.[179]

### 2.4.2.2. Classification of the Georgia-Pacific Factors

A treatise on the subject of intellectual property law and damages classifies the 15 *Georgia-Pacific* factors into two broad groupings of: (1) licensing activity (including prior and existing licenses, licensing policies and industry customs); and (2) the value of the patent (including anticipated profits, benefits of the invention, value of the invention, available non-infringing alter-

---

[179] Ibid.

compared to use of non-infringing devices or processes. Again, a willing buyer would only agree to a royalty if it was predictable that he would obtain an economic benefit, such as a higher projected profit.

In determining anticipated profits at the time of the hypothetical negotiation, the courts often consider the infringer's actual profit performance over the period of infringement.[189] Even though the courts look to anticipated profits, the reasonable royalty award is not a lost profits damage theory. Indeed, because the determination of a reasonable royalty should be based on anticipated profits, "there is no rule that a royalty be no higher than the infringer's net profit margin."[190] In fact, the Federal Circuit has held that it is irrelevant that the infringer did not actually meet its anticipated profit projections.[191]

Additionally, although "[t]he established royalty rate . . . should be applied only to *sales of infringing products* to avoid running afoul of the policy in patent law against extending patents beyond their lawful scope," the courts recognize that the infringer's anticipated profits may include collateral benefits in addition to direct profits from the patented invention, which the parties would take into account in negotiating a reasonable royalty rate.[192] In other words, a potential licensee would consider the profits that it would obtain from convoyed sales of parts, supplies, accessories, and related products, as well as those profits that flow or would be expected to flow from the right to manufacture, use or sell that patented invention. The theory is that "[w]here a hypothetical licensee would have anticipated increased convoyed sales as a result of a patent license, such sales may be considered in fixing a reasonable royalty rate because the licensee would in theory be disposed to pay a higher royalty if it could expect such collateral benefits."[193] Moreover, if the patent owner is in the business of selling the patented product, he would have demanded a higher royalty to compensate for the loss of such collateral benefits.

In addition, in determining the value of the patent, the relative contribution of the patented feature is a factor that is taken into account. If the contribution of the patented invention is significant, a higher royalty would have resulted from the hypothetical negotiation.[194] Conversely, if the patent were less significant, then a "willing buyer" would have been less willing to pay a higher royalty. In assessing the relative importance of this factor, courts may look to whether the patent was a "pioneer patent," under the theory that a pioneer patent has manifest commercial success.[195] Nevertheless, because the relative contribution of a patented invention varies greatly within each field and for each patent, the weight accorded this factor varies with the circumstances of the individual case.

---

[189] See, e.g., *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990). See also, *Bose Corp. v. JBL, Inc.*, 112 F. Supp.2d 138, 168 (D. Mass. 2000) (examining the infringer's sales over the infringement period).

[190] *State Industries, Inc. v. Mor-Flo Industries, Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990).

[191] See *Interactive Pictures Corp. v. Infinite Pictures Corp.*, 274 F.3d 1371, 1384–1385 (Fed. Cir. 2002).

[192] *A & L Technology v. Resound Corp.*, 1995 WL 415146 (N.D. Calif. 1995) (Emphasis added).

[193] Ibid.

[194] See *Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 1175, 1184 (D. Colo. 2002) ("a large portion of the realizable profit should be attributed to the uniqueness of the invention patented").

[195] See, e.g., *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir.) *(en banc), cert. denied*, 516 U.S. 867 (1995).



It is also assumed that a "willing buyer" in a hypothetical negotiation would be more disposed to pay a higher royalty if the patented invention was fully developed and commercially in place. The rationale is that the buyer would have to expend less time and capital to bring its product or service to market. As such, a buyer would pay more for a "developed" invention than for one that the buyer was required to spend substantial capital and investment to develop, market, use or commercialize.

Another important factor that is considered in the hypothetical negotiation is the remaining term of the patent at the time of the infringement. Generally, it is believed that a buyer would have been more likely to agree to a higher royalty the longer the remaining term of the patent. A defendant, however, may argue that the longer the remaining patent term, the lower the royalty. That is, knowing it would have to pay considerable royalties for an extended period, the defendant may argue that it would have had a greater incentive to design around the patent.[196]

Finally, in assessing a reasonable royalty, the courts will take into consideration whether the defendant had any non-infringing alternatives that were equal in terms of cost and performance. If a non-infringing alternative exists, the defendant, as the "willing buyer," "would have been in a stronger position to negotiate for a lower royalty rate knowing it had a competitive noninfringing device in the wings."[197] The defendant infringer, however, must prove that: (1) the alternative is sufficiently similar to the infringed patent, and (2) the non-infringing alternative was available, that is, in existence and covered by a patent owned by a third party, at the time the infringement began.[198] On the other hand, the patent owner may demonstrate that the infringer's copying of the patented invention demonstrates that the invention is not "worthless," but rather shows that the invention has "several advantages" over the proposed non-infringing alternatives.[199]

### 2.4.2.3. Date of Hypothetical Negotiation

For measuring reasonable royalty rates, the courts have looked to the date when infringement first began. The hypothetical licensor and licensee are assumed to voluntarily meet on that date with information that addresses the first fourteen *Georgia-Pacific* factors and agree upon a reasonable royalty. This form of analysis limits the information available for the hypothetical negotiation to that available (1) before the commercial success of the patent could be determined, (2) before actual profitability could be determined, and (3) even before customer acceptance could be determined. It limits the estimation of a reasonable royalty to budget, forecast, plan pricing, and project operating costs, and, therefore, projections of profits.

[196] See, e.g., *Schneider (Europe) AG v. SciMed Life Systems*, 852 F. Supp. 813, 848 (D. Minn. 1994) ("At the time of the hypothetical negotiation, the . . . patent still had fourteen years left. This factor tends to favor [the infringer] and decreases the reasonable royalty rate slightly.").

[197] *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-1572 (Fed. Cir. 1996).

[198] See generally, 7 *Chisum on Patents*, § 20.03[3][b][v] (2000).

[199] See, e.g., *GNB Battery Technologies, Inc. v. Exide Corp.*, 886 F. Supp. 420, 439 (D. Del. 1995).

Notably, it is often many years after infringement starts before the patent holder becomes aware of the infringement, brings suit against the defendant, and litigates the issues. In addition, trials often are held years after the patent holder notifies the infringer of infringement and the infringement suit is filed. During this extended period, much information becomes available about the patent and its success that might not have been anticipated or available at the hypothetical negotiation date when infringement began. As a result, the analyses and outcomes under the first fourteen *Georgia-Pacific* factors will often be different if the court limits itself to information available on or before the date of first infringement.

The courts have addressed the use of information that becomes available only after the date at which the hypothetical negotiation is assumed to have taken place (the date of first infringement). For example, in *Fromson v. Western Litho Plate and Supply Company*, the court stated that "[t]he methodology encompasses fantasy and flexibility; fantasy because it requires a court to imagine what warring parties would have agreed to as willing negotiators; flexibility because it speaks of negotiations as of the time infringement began, yet permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators."[200]

Some courts have cautioned against treating the negotiation as one with full knowledge of future events. In *Integra Lifesciences v. Merck,* the Federal Circuit ruled that "[t]he first step in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred."[201] The Federal Circuit went on to reverse and remand the reasonable royalty verdict because "the record does not clearly indicate whether 1994 or 1995 is the proper date for the first infringement."[202] In its opinion, the court emphasized the importance of determining the first date of infringement because "[t]he value of a hypothetical license negotiated in 1994 could be dramatically different from one undertaken in 1995 . . . [as] a year can make a great difference in economic risks and rewards."[203]

### 2.4.2.4. Analyses to Support an Opinion on a Hypothetical Negotiation

To maximize the effectiveness of an analysis of a hypothetical negotiation, the expert may want to perform the following types of analysis, depending on the facts of the case, consistent with the *Georgia Pacific* and hypothetical negotiation parameters:

---

[200] *Fromson v. Western Litho Plate and Supply Company,* 853 F.2d 1568, 1575 (Fed. Cir. 1988).

[201] *Integra Lifesciences v. Merck,* 331 F.3d 860, 870 (Fed. Cir. 2003).

[202] Ibid.

[203] Ibid.

| Georgia Pacific Factor(s) | Analysis | Where to Find |
|---|---|---|
| 1, 2, 3 | Review of existing license agreements pertaining to the intellectual property in suit or similar intellectual property. These agreements may be between plaintiff and defendant, between either of the parties and others not involved in the suit, or between parties not involved in the suit. In general, the closer the technology and the parties, the more relevant the agreements. | Commercial royalty databases, public filings, licenses involving the parties to the case (often produced in discovery), financial records of the parties. |
| 8, 12, 13 | Profitability of products covered by the intellectual property in suit compared to that of other products. | Company financial records, public filings, sales reports, and invoices. |
| 8, 9, 10 | Review of marketing materials to determine the importance of the covered feature to the sales and profitability of covered and infringing products. | Company financial statements, internal company correspondence, marketing plans, correspondence with customers, sales training materials, customer opinion surveys. |
| 5 | Documents pertaining to the competitive relationship between the companies. | Internal correspondence, licensing history and correspondence, each party's customer list. |
| 4 | Documents pertaining to the amount of protection and effort the plaintiff places on its intellectual property. | Correspondence, testimony of company management. |
| 9 | Cost savings and other benefits of the intellectual property in suit. | Internal correspondence, financial records, and correspondence. |
| 15 | Financial position of companies and need for intellectual property and product sales. | Financial statements and records over time, particularly as of date of first infringement. |
| 6 | Collateral sales and related product sales. | Sales invoices showing how often the products are sold together, marketing literature. |

## 2.4.3. Updates to Georgia-Pacific

In *Honeywell v. Minolta,* the court's jury instructions provided a list of factors to consider when determining a reasonable royalty.[204] This list—which differs somewhat from the *Georgia Pacific* list of 15 factors—includes the following factors:

1.  The anticipated amount of profits the prospective licensor reasonably thinks would be lost, as a result of licensing the patent, compared to the anticipated royalty income.

2.  The relative bargaining strengths of both the patent owner and the infringer.

3.  The anticipated net profits that the prospective infringer reasonably thinks they will earn.

---

[204] *Honeywell v Minolta,* Civil Nos. 87-4847, 88-1624 (N.D. N.J. 1992), jury instructions at 69.

4. The commercial past performance of the product, i.e., in terms of profits and public acceptance.

5. The market to be "tapped."

6. Any other economic factor that would be taken into account by a normally prudent business-man, under similar circumstances, when negotiating a hypothetical license.

Although the *Georgia-Pacific* and *Honeywell v. Minolta* factors provide guidelines when determining a reasonable royalty, they do not represent the only viable approaches to determining a reasonable royalty. "The amount of a reasonable royalty after infringement turns on the facts of each case, as best they may be determined."[205] For assistance in the establishment of a royalty rate, the analyst may want to consult searchable databases such as those identified on Appendix A.

## 2.4.4. Other Methods of Measurement

### 2.4.4.1. The 25-Percent Rule

Under this methodology, the royalty rate is set between 25 and 33 percent of operating profit depending on a number of factors and considerations between the patent holder and the infringer.[206] The rationale for leaving between 67 and 75 percent of the profits to the licensee is the assumption of greater financial risk in commercializing the technology.

Although this methodology has received criticism for being overly simplistic, it has proven useful to the courts:

> The 25% rule is a shorthand phrase for a method of dividing expected profit between a licensor and licensee. It divides net pretax profit with normally 25% of that profit being paid to the licensor as a reasonable royalty, while 75% is reserved to the licensee as its profit for the risks attendant to manufacturing and marketing. Normally, the net profit that is divided is . . . that of the licensee. Sometimes the licensor's net profit rate may be used, however, where the licensee's profit rate is not known. While a trial court is not limited to selecting one or the other of the specific royalty figures proposed by the opposing parties, *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d at 1168, the court here finds that the 25% rule is an appropriate rationale for determining a base royalty rate. Defendant's licensing expert, Mr. Robert Goldscheider, noted that he first became familiar with the 75%/25% distribution of licensing profits when he began to do licensing work in 1959 and 1960. Since that time, defendant's expert has participated in several hundred licensing negotiations involving intellectual property, and, according to Mr. Goldscheider, he and "at least two other highly respected pioneers in the field of licensing" have written published works concerning

[205] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (Sixth Cir. 1978).

[206] M. A. Glick. *Intellectual Property: The Law and Economics of Patent Infringement Damages*. http://www.econ.utah.edu/les/version_2.0/papers/law&econpats.htm. See, e.g., Robert Goldscheider, *The Licensing Law Handbook* (1993–94). Reference to this rule can be found in *Tektronix, Inc. v. U.S.*, 552 F.2d 343, 350 (Ct. Cl. 1977); *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22 (Fed. Cir. 1984); *Syntex Inc. v. Paragon Optical Inc.*, 7 U.S.P.Q. 2d 1001, 1027 (D. Ariz. 1987); and *Polaroid Corp. v. Eastman Kodak Co.*, 16 U.S.P.Q. 2d 1481, 1535 (D. Mass. 1990). See also: R. Goldscheider, J. Jarosz, and C. Mulhern. *Use of the 25 Per Cent Rule in Valuing IP*, *les Nouvelles*, pp. 123–133, December 2002.



the 25% rule. In addition, the 25% rule or a close variant of it has been recognized by a number of other federal courts as a "rule of thumb" or "typical" in the licensing field.[207]

Although sole reliance on the 25 percent rule may not be appropriate, the rule may be useful as a starting point or frame of reference. The results should be adjusted based on all relevant facts and circumstances.

### 2.4.4.2. The Analytical Method

Another measurement methodology is the *analytical method*. The royalty calculation under this method is based on the infringer's own internal profit projections for the infringing item at the time the infringement began. The analytical method is based on the premise that any rate of return in excess of a normal rate of return can be attributed to the patent. This method takes the profits of the infringer, subtracts the infringer's normal profit, and awards some portion of the remainder to the patent owner.

For example, in *TWM Mfg. Co., Inc. v. Dura Corp.*,[208] the Special Master computed "reasonable royalty" damages based on an internal memorandum, written by the infringer's top management before the infringement began. The memo indicated that the infringer projected a substantial gross profit (52.7 percent) from the proposed infringing sales. Using this figure, the Special Master subtracted overhead expenses to obtain the infringer's projected net operating profit (37 percent to 42 percent) and then divided the projected net operating profit between the infringer and the patent holder. The Special Master concluded that, at the time infringement began, the infringer would have accepted the standard industry profit on the item. The profit for the infringer was set at the standard industry rate (6.6 percent to 12.5 percent), and the remaining 30 percent became the "reasonable royalty."

On appeal to the Federal Circuit, the infringer contended that it was erroneous for the Special Master to use this method, asserting that the more traditional "willing licensor-willing licensee" test was legally mandated. The infringer also downplayed the significance of its pre-infringement memorandum, highlighting instead that the actual profits realized on the infringing products were much lower than the projected figures. The Federal Circuit, however, rejected the infringer's contentions and affirmed the award. After noting that there is no single way to determine patent damages, the Federal Circuit held that it was of no consequence that a lesser royalty may have resulted from another analysis.[209] "On appeal, an infringer cannot successfully argue that the district court abused its discretion in awarding 'high' royalty by simply substituting its own recomputation to arrive at a lower figure."[210] The only relevant question was whether or not

---

[207] *Standard Manufacturing Co., Inc. and DBP, Ltd. v. United States*, 42 Fed.Cl. 748 (1999).

[208] *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986).

[209] Ibid.

[210] Ibid.

the method used by the lower court was proper, and the appellate court concluded that it was. In particular, the Federal Circuit upheld the Special Master's use of the analytical method because, unlike the infringer's alternative, it focused on the critical time when infringement began rather than thereafter.

Although making profit projections is typically not straightforward, an advantage of the analytical method to the patent holder is that it attempts to use the information upon which the infringer based its decision to infringe. In some cases, pre-infringement projections can become a real impediment to the infringer in the midst of litigation. As discussed above, the courts have found pre-infringement memorandums and projections to be particularly relevant, since the infringer based its decision to manufacture and market the infringing product on the very information being used to determine the reasonable royalty amount.

An infringer's defense to a reasonable royalty case based on the analytical method is often to attack its own profit projections. Rather than present evidence of a lower actual profit margin or evidence dated after the date infringement first began, the infringer attempts to undercut the reliability of its own proprietary documents dating from the time when infringement began.

### 2.4.4.3. Discounted Cash Flow Analysis

Discounted cash flow analysis is a method of valuing an investment based on the estimated future cash flows, taking into consideration the time value of money.[211] "The discounted cash flow (DCF) method for determining a corporation's enterprise value has three main components: (a) an estimation of net cash flows that the firm will generate and when, over some period; (b) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and (c) a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value . . . [with] 'terminal value' [being] the value of cash flows expected to be received by the company beyond the 'terminal year' (which is the final year for which particularized cash flow projections are made) discounted to the 'present value'. . . "[212]

## 2.4.5. Reasonable Royalty in Copyright Disputes

In copyright disputes, if the copyright owner and the infringer compete in the same market, the courts may use a *lost sales* measurement to compensate for the sales that would have been made "but for" the defendant's infringement. If the owner and infringer serve different markets, the courts may use a *reasonable royalty* or *market value* test to determine the hypothetical reasonable royalty that the copyright owner would have received for the defendant's use. In a

---

[211] P.E. Fess and C. S. Warren, *Accounting Principles,* Sixteenth Edition. *Cincinnati, OH:* South-Western Publishing Co., p. 1104, 1990.

[212] *Steiner Corp. v. Benninghoff,* 5 F. Supp. 2d 1117 (D. Nev. 1998).

dual market context, some courts have held that the value lost by the copyright owner should be approximated from the infringer's acts that prevented the copyright owner from taking advantage of that particular market.

Unlike the patent law, the Copyright Act makes no mention of treating a reasonable royalty as a minimum damage measure. Not unlike the patent law, however, the question posed by Section 504(b) is "what a willing buyer would have been reasonably required to pay to a willing seller for plaintiffs' work."[213]

The measurement of damages for copyright infringement is not as well established as that for patent infringement, in large part because appeals of copyright cases are taken to the appellate court in the region in which the case was filed, rather than solely to the Federal Circuit. This causes judicial precedent in copyright cases to be regional in nature rather than national in scope. The copyright analyst is advised to seek counsel's input and review case law from pertinent jurisdictions.

If the court selects a reasonable royalty measure of damages, it may attempt to determine the amount that the infringer would have paid for the right to use the copyrighted work legally. Just as in patent cases, any preexisting licenses may offer a measure of the appropriate reasonable royalty.[214] For example, in *McRoberts Software, Inc. v. Media 100, Inc.*, the court determined that the jury had ample evidence from which to estimate the value of the competitor's use of the copyrighted source code and arrive at its $1.2 million actual damage award for copyright infringement. Finding that the jury had evidence of the copyright owner's past agreements with the infringing competitor to develop and modify prior versions of the copyrighted material, the court ruled that there was a sufficient basis for the damage award.[215]

The reasonable royalty may take the form of a lump sum representing the reasonable value of the work. Alternatively, the royalty may be a percentage of the licensee's profits. In *On Davis v. The Gap, Inc.*, the court determined that a copyright owner's loss of a reasonable royalty or license fee to which a willing buyer and a willing seller would have agreed may serve as its "actual damages" supporting recovery under the Copyright Act.[216]

A defendant may attempt to distinguish preexisting licenses based on (1) the types of uses that they authorized, (2) the amount of the copyrighted work that was used, and (3) the changing value of the copyrighted work over time.

---

[213] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (Ninth Cir. 1985).

[214] *Rogers v. Koons*, 960 F.2d 301, 313 (Second Cir. 1992).

[215] *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557 (Seventh Cir. 2003).

[216] *On Davis v. The Gap, Inc.*, 246 F.3d 152 (Second Cir. 2001).

## 2.4.6 Unjust Enrichment

*Unjust enrichment* is an alternative damages measure to compensatory damages. While compensatory damages seek to restore the plaintiff to the financial position in which it would have been but for the defendant's wrongful act, unjust enrichment seeks to deprive the defendant of whatever gain or benefit it obtained from the wrongful act. In essence, unjust enrichment compels the defendant to disgorge all ill-gotten gains to the owner of the infringed intellectual property.

As discussed previously, Dan Dobbs (in his book *Dobbs Law of Remedies: Damages—Equity Restitution*) identified five methods for measuring the gain obtained by a defendant for purposes of an unjust enrichment award.[217] The unjust enrichment remedy is frequently employed by the courts in copyright, trademark, and trade secret litigation and is incorporated in the federal statutes governing intellectual property. With respect to copyrights, Section 504(b) of the Copyright Act provides that "[t]he copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."[218] Therefore, unless it is duplicative, recovery of both actual damages and the defendant's profits is allowed.

With respect to trademarks, the Lanham Act authorizes a trademark owner to recover both the infringer's profits and its own damages sustained "subject to the principles of equity and upon such terms as the court deems reasonable . . ."[219]

The UTSA provides that, in addition to recovering its actual loss, a trade secret owner may recover the "unjust enrichment" caused by the misappropriation to the extent the enrichment is not taken into account in calculating the owner's actual loss.[220] Unjust enrichment is also permitted as a measure of damages in design patent disputes, but it is unavailable for utility patents.

A copyright owner may be entitled to recover indirect profits from copyright infringement. However, before doing so, the copyright owner must first demonstrate that the infringing acts had an effect on the profits earned by the infringer.[221] In *Mackie v. Rieser*, the court determined that the artist was not entitled to indirect profits from the symphony's infringement of his copyrighted sculpture, even through an unauthorized photograph of the sculpture was used in an advertising brochure. The court indicated that since it could not determine how many individuals subscribed because of the artist's work, any claim for indirect profit was speculative and unsupported.[222]

---

[217] See Section 2.2.2 above.

[218] 17 USC § 504(b).

[219] 15 USC § 1125 (c)(1).

[220] Uniform Trade Secrets Act with 1985 Amendments, p. 11.

[221] *Mackie v. Rieser*, 296 F.3d 909 (Ninth Cir. 2002).

[222] Ibid.

In *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* the Ninth Circuit Court of Appeals addressed the issue of indirect profits of the infringer.[223] In that case, the court determined that the MGM Grand Hotel had infringed on a music copyright belonging to Frank Music. The music was part of MGM's musical revue entitled *Hallelujah Hollywood* and was heavily promoted to the public as a lead attraction of MGM. After calculating actual damages for infringement, the court determined that the copyright owner was entitled to indirect profits and the court awarded the copyright owner a portion of MGM's total profits. However, before indirect profits may be awarded, the court "must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits."[224]

Revenues to be included in an unjust enrichment measure of damages may need to reflect application of the entire market value rule. Refer to the discussion in Section 2.3.2.9., "Entire Market Value Rule," above. If more than simply the copyrighted or trademarked work is included in revenues, an apportionment of the resulting profit to the infringement may be necessary. Refer to the discussion in Section 2.4.6.2, "Apportionment," below.

### 2.4.6.1. Costs in Unjust Enrichment Claims

As indicated above, profits from unjust enrichment, as well as for lost profits, are calculated as sales from the units in question, less costs associated with producing and selling the additional units. In both lost profits and unjust enrichment claims, the burden to prove the sales in question falls on the plaintiff. The burden to prove costs, however, falls on *defendant* in unjust enrichment claims, while it remains with *plaintiff* in claims of lost profits. To prove unjust enrichment, once the fact of damages has been proved, plaintiff bears only the responsibility to prove the quantum of sales, although plaintiff may rebut the testimony of defendant on cost issues.

In *Johnson v. Jones*, the court determined that once the plaintiff in a copyright infringement suit had met the burden of establishing infringer's gross revenue, the burden then shifted to the infringer to prove expenses to deduct from that amount. In the absence of such proof, the plaintiff was entitled to recover the infringer's gross revenue from the infringement. It was not enough that the infringer testified as to the average profit margin, as infringement may allow the infringer to recognize net profit at a much larger profit margin percentage of its gross revenue than in the absence of infringement.[225]

In *On Davis v. The Gap, Inc.,* a copyright case, the Ninth Circuit Court of Appeals narrowed the definition of revenues to be used in the damage claim, stating "we think the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues."[226] In arriving at its decision, the Ninth Circuit relied in part on the Seventh Circuit's 1983

---

[223] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 886 F.2d 1545, 1551 (Ninth Cir. 1989).

[224] *Mackie v. Reiser,* 296 F.3d 909 (Ninth Cir. 2002).

[225] *Johnson v. Jones,* 149 F.3d 494 (Sixth Cir. 1998).

[226] *On Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (Ninth Cir. 2001).

decision in *Taylor v. Meirick*, which held that the copyright owner was entitled to profits of the infringer related to infringed product sales, but not on everything the infringer sold. Therefore, to establish a *prima-facie* case, the copyright owner should show the infringer's gross sales of infringing products.[227] Notably, the Seventh Circuit in the *Taylor* case explained its logic in interpreting the statute as follows: "If General Motors were to steal your copyright and put it in a sales brochure, you could not just put a copy of General Motors' corporate income tax return in the record and rest your case for an award of infringer's profits."[228]

Consistent with the discussion above on incremental costs, some courts accept as deductible expenses only those costs directly attributable to the production, distribution, performance, or display of the infringing work. For the infringer to deduct such expenses, it should prove them with a reasonable degree of "specificity."[229] In some federal circuits, the acceptable profit measure is not incremental profit; rather, it is based on a full recognition of the costs related to the infringement, including overhead and fixed costs. Some courts, however, have refused to recognize certain overhead costs. The attorney should provide guidance to the analyst in this area.

A trademark owner is only entitled to receive infringers "profits" under Section 35(a) of the Lanham Act; in other words, the infringer's net revenues. Determining which costs are deductible from gross revenues to arrive at an infringer's profits, however, is not an easy task. There are a number of competing standards for measuring appropriate cost deductions. Under the *differential cost rule*, sometimes referred to as the incremental approach, only specific costs that would not otherwise have been incurred but for the production of the infringing goods are allowed as deductions. Fixed costs, such as rent for manufacturing facilities, would not be deducted. Only variable costs, such as the raw materials and the labor that actually go into manufacturing the infringing product, are allowed as deductions. This is the most favorable rule for trademark owners.

The *direct assistance rule* is a variant of the differential cost rule that is more generous to infringers. Under the direct assistance rule, costs that directly assisted in the production of the infringing goods are allowed as deductions. The benefit to infringers under this rule is that some elements of overhead and general administration are permitted deductions. This is the approach taken under the *Restatement (Third) of Unfair Competition*.

The *fully allocated cost rule*, sometimes referred to as the full absorption approach, is even more generous to infringers. Under this rule, all expense items properly allocated under generally accepted accounting principles to production of the infringing goods are allowed as deductions.[230] The analyst should seek the guidance of counsel on the rules that apply in the relevant jurisdiction.

[227] *Taylor v. Meirick,* 712 F.2d 1112, 1122 (Seventh Cir. 1983).

[228] Ibid.

[229] *Allen-Myland v. International Business Machines Corp.*, 770 F. Supp. 1014, 1024 (Third Cir. 1991).

[230] Terence P. Ross, Editor. *Intellectual Property Law Damages and Remedies: Updated through Release 4,* New York: Law Journal Press, p. 4-28, 4-29, 2003.

## 2.4.6.2. Apportionment

The Copyright Act, the Lanham Act, and the UTSA each provide that in an unjust enrichment claim, the intellectual property owner shall recover only the net profits of the infringer *attributable to the infringement*. By comparison, in a lost profits claim, all of the profits derived from infringing sales are awardable as damages. As a result, in an unjust enrichment claim, only the portion of profits from infringing sales that can be ascribed to the intellectual property in question are to be awarded.

Similar to the issue of proving deductible costs, in an unjust enrichment claim, it is defendant's responsibility to prove the deduction from sales to adjust for the apportionment of profits to the various assets that contribute to the sale of an infringing item. Plaintiff may rebut the testimony of defendant on this issue.

Some examples of factors relevant to apportionment are:

1. Costs of capital.
2. Intellectual property elements.
3. Business reputation.
4. Quality and functionality of product.
5. Manufacturing ability.
6. Marketing and advertising.
7. Hotel guest accommodations.
8. Restaurants.
9. Talents of producers/directors/performers.

Many other factors can and should be considered in determining the appropriate apportionment.

Since apportionment is required in a disgorgement claim but not in a lost profits claim, a plaintiff typically will attempt to prove lost profits when capable of doing so. Apportionment is also not required in statutory damages.[231]

In general, courts recognize the inherent difficulty in analyzing apportionment. As a result, they tend to require greater certainty in proof of the existence of damages, and exhibit somewhat greater flexibility in the proving of apportionment.

*2.4.6.2.1. Apportionment Based on Cost.* Apportionment should be done on the basis of relative value. In economics, it is common to find that the relative cost or price of a component or element is a fair measure of its relative value. That is, something that costs twice as much is often worth twice as much. If that is true for a particular product, it may be reasonable to apportion profits in proportion to the cost of the components.

---

[231] *Nintendo of America, Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (Ninth Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995).

Other cost-based apportionment methodologies may involve elements other than cost of goods sold. For example, in a copyright case involving advertising, the relative cost (and volume) of infringing advertising to total advertising may be one step in the apportionment process. Since a portion of the value of the good being advertised may come from its inherent quality and desirability, and another portion may come from the advertising, the analysis may also include the relative cost of advertising as a whole compared to the cost of goods sold.

Cost-based apportionment is inappropriate if the cost of some elements may not represent their value. This is particularly true if valuable elements are obtained at no cost (for example, because they are already owned by the infringer) or if the cost or value of the elements are not easily measured, such as the value of a brand name. For example, in *Columbia Machine & Stopper Corp. v Adriance Machine Works*,[232] the expert attempted to apportion a machine's profits to the infringing element by using a fraction dividing the cost of the infringing part by the total cost of the machine. The court, however, rejected this approach, finding that part cost was not a fair measure of the relative contribution of the infringing element.

**2.4.6.2.2. Alternative Non-Infringing Hypothetical Market.** This methodology calls for the creation of a hypothetical supplementary yet non-infringing product with a resulting estimate of the profit created by this product. Under this method, the expert would subtract the hypothetical non-infringing profits from the actual profits made during the sale of infringing products and apportion the difference to the infringing feature.

**2.4.6.2.3. Volume Basis.** In some cases, the volume of the infringing elements as a portion of the total work is a rational basis for apportionment. For example, in *Frank Music*,[233] the performing act that used the infringing music constituted approximately 12 percent of the show's weekly running time, and the court attributed 12 percent of the show's profits to the infringement.[234] There is, however, no bright line rule.

For example, in *Lottie Joplin Thomas Trust v. Crown Publishers*, the defendant used copyrighted materials in a compilation set.[235] The defendant argued that because the infringing portion comprised 10 percent of the total collection, the plaintiff was entitled to 10 percent of the total profit. The court found this method unacceptable, because the product was marketed as a complete collection and the absence of the infringing material would have had a substantial effect on the overall value of the product. The court ultimately awarded 50 percent of the profits based on the infringed materials, reasoning that the additional products would be purchased to complete the collection.

---

[232] *Columbia Machine & Stopper Corp. v. Adriance Machine Works*, 79 F.2d 16 (Second Cir. 1935).

[233] *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (Ninth Cir. 1985).

[234] The Ninth Circuit made adjustments to the 12 percent based on other factors not relevant to this discussion.

[235] *Lottie Joplin Thomas Trust v. Crown Publishers*, 456 F. Supp. 531, 538 (S.D.N.Y. 1977), *aff'd*, 592 F.2d 651 (Second Cir. 1978).

Similarly, in *Nintendo of America, Inc. v. Dragon Pac. Int'l*, the defendant packaged multiple video games on a single Nintendo cartridge, and the expert argued that because 33 percent of the games packaged on a cartridge were Nintendo games, 33 percent of profits was an appropriate apportionment.[236] The court rejected that argument, reasoning that since the entire cartridge was marketed as a Nintendo product, the plaintiff had received the benefit of the Nintendo trademark on all games included on the cartridge.

### *2.4.6.3. Stacked Royalties*

The question of the value of intellectual property is complicated if the defendant has expenses (either real or imputed based on its own intellectual property contribution) for other intellectual property used with the product in question. For example, if the product uses other patented technology or earns premium pricing due to a trademark, it may be appropriate to consider the other contributory intellectual property assets in the apportionment analysis.

The court addressed this issue in *Integra v. Merck.*[237] In that case, plaintiff's patents related to segments of certain proteins that, by interacting with certain receptors on the surfaces of cells, induced better cell adhesion and growth aimed at promoting wound healing. Integra was awarded $15 million in reasonable royalty damages at trial. On appeal, the Federal Circuit found that the number of patent licenses needed to develop a drug may also affect the value placed on any single technology used in the development process and remanded the case to the district court for further proceedings. On remand, the court reduced the damages to $6.375 million.

Stacked royalties can also apply to the determination of a reasonable royalty if multiple licenses exist with a single product.

## 2.5. OTHER DAMAGE CALCULATIONS

In addition to compensatory damages in the form of lost profits, reasonable royalties or unjust enrichment, augmented damages in excess of the compensatory measure of recovery may be awarded in appropriate cases. Augmented damages may include enhanced statutory damages and punitive damages.[238]

Certain intellectual property damage statutes permit the award of enhanced damages at the discretion of the court. For example, in a patent case, upon a finding of willful infringement, the court may award up to treble damages plus attorney's fees and costs. In trademark disputes, a court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual

---

[236] *Nintendo of America., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (Ninth Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995).

[237] *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003) and *Integra Lifesciences I, Ltd. v. Merck KGaA*, 2004 WL 2284001 (S.D.Cal. 2004).

[238] Punitive damages are rarely awarded in intellectual property cases and are not discussed in detail in this Practice Aid.

damages, not exceeding three times such amount. If the court finds that the amount of the recovery based on lost profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court finds to be just, according to the circumstances of the case.[239]

In a copyright matter,[240] the defendant who prevails may be awarded attorney's fees against the plaintiff.

## 2.5.1. Market Value

If neither lost sales nor a reasonable royalty have an empirical basis, an infringed copyright owner may employ the *market value test* as an alternative measure of actual damages. The market value test estimates the fair market value that a willing buyer would have paid a willing seller for the use of a work.

Applying the market value test, a number of courts determine the value to the infringer for the use of the copyrighted work, rather than the value a willing buyer and willing seller would have negotiated. Although this difference may at first blush seem semantic, it can make a substantial difference in the determination of value.

There are two instances in which the market value measure of the copyright owner's damages is generally employed, namely (1) if the defendant infringer or defendant's infringement has harmed the reputation or the value of the copyrighted work for a particular market, or (2) if (a) the defendant has made no profits from the infringement, (b) the copyright owner has no proven lost sales, and (c) the circumstances of the market make the probability of a negotiated license unlikely.[241]

The copyright owner's actual damages may consider the "extent to which the market value of the copyrighted work at the time of infringement has been injured or destroyed by the infringement."[242] This concept was applied in *Montgomery v. Noga*. In that case, actual damages for infringement of a copyrighted computer program were awarded based on the impact of the infringement on the value of an unregistered version of the program that had been derived from the copyrighted program. The court ruled that in determining the magnitude of the injury to the value of the registered copyright at the time of infringement, the value of the protected program would not be determined solely by reference to the market value of the copyrighted program as a stand-alone product.[243]

---

[239] 15 USC § 1117.

[240] 17 USC § 504(d).

[241] S. A. Edelman and Terence P. Ross. *Intellectual Property Law Damages and Remedies: Updated through Release 4*, New York: Law Journal Press, p. 2-25, 2003.

[242] Radack, D.V. (1998) "Remedies for Copyright Infringement", *JOM*, 50 (5) (1998) p. 51, www.tms.org/pubs/journals/JOM/matters/matters-9805.html.

[243] *Montgomery v. Noga*, 168 F.3d 1282 (Eleventh Cir. 1999).

## 2.5.2. Statutory Damages

### 2.5.2.1. Statutory Damages for Counterfeit Trademarks

In cases involving the usage of a counterfeit trademark, the plaintiff may elect, prior to the court rendering final judgment, to recover not less than $500 nor more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale or distributed, as the court considers just.[244] Alternatively, if the court finds that the use of the counterfeit mark was willful, the plaintiff may elect, prior to the court rendering final judgment, to recover not more than $1 million per counterfeit mark per type of goods or services sold, offered for sale or distributed, as the court considers just.[245] A counterfeit mark is defined as:

> (i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or (ii) a spurious designation that is identical with, or substantially indistinguishable from a designation as to which the remedies . . . are made available . . .[246]

With respect to domain names, the plaintiff may elect, prior to the court's entry of final judgment, to recover in lieu of actual damages or profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.[247]

### 2.5.2.2. Statutory Damages for Copyrights

The Copyright Act allows the plaintiff to obtain statutory damages if the copyright owner is unable to prove his actual damages or the defendant's profits. The statutory amount of damages is to be:

> in a sum of not less than $750 or more than $30,000 as the court considers just . . . In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200.[248]

---

[244] 15 USC § 1117(c).

[245] 15 USC § 1117(c)(2).

[246] 15 USC § 1116(d).

[247] 15 USC § 1117(d).

[248] 17 USC § 504.

## 2.5.3. Corrective Advertising

In fixing damages, courts may take into consideration the cost of a corrective advertising campaign the trademark owner conducts in order to repair the effect of the defendant's misleading advertising. The purpose of such a campaign is to correct any misimpressions that were formed in the marketplace due to the infringers' actions and thereby return the plaintiff to a preinfringement state.

For example, in *U-Haul International, Inc. v. Jartran, Inc.*, the trial court awarded damages twice the amount of the original false ad campaign.[249] In *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Company,* the court held that corrective advertising damages were equal to 25 percent of the defendant's advertising expenditures in the relevant market. In reaching its conclusion, the court based its analysis on the Federal Trade Commission guideline that often requires businesses engaging in misleading advertising to spend 25 percent of their advertising budget on corrective advertising.[250]

It is often advantageous to seek the opinion of practitioners seasoned in the art of developing advertising campaigns, such as public relations or advertising professionals, to opine on the amount of corrective advertising required to reverse customer confusion or the adverse impact of infringement. Analysis of the advertising levels expended by the parties to the suit may also be probative.

---

[249] *U-Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (Ninth Cir. 1986).

[250] *Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Company,* 561 F.2d 1365, 1375 (Tenth Cir. 1977).

# 3. CONCLUSION

This Practice Aid provides the practitioner with a discussion of the theoretical, legal, economic, and accounting foundations of intellectual property and the methodologies commonly employed in the calculation of infringement damages. Notably, the United States courts continue to award damages in intellectual property cases under a variety of theories and analyses, giving the damages expert freedom to explore the economic consequences of the infringing activity. As in calculating damages under any civil cause of action, the expert should carefully consider the facts and circumstances of the dispute at hand.

# APPENDIX A:
# INTELLECTUAL PROPERTY PRINT AND
# ELECTRONIC RESOURCES (NONEXHAUSTIVE LIST)

## PERIODICALS AND PUBLICATIONS

There are many periodicals and publications that either discuss the valuation of intellectual property assets or contain market information regarding the sale, transfer, or exchange of intellectual property. Although it is not within the scope of this Practice Aid to identify all of the potential sources for this kind of information, some recommended sources include the following:

- *Intellectual Property Law: Damages and Remedies,* Terrence P. Ross (2004), Law Journal Press, 105 Madison Avenue, New York, New York 10016, www.lawcatalog.com.

- *Licensing Economics Review,* 155 Gaither Drive, P.O. Box 1050, Moorestown, NJ 08057.

- *Les Nouvelles* (a Journal of the Licensing Executives Society). Alexandria, VA. Licensing Executives Society (U.S.A. and Canada), Inc., 1997.

- *Intellectual Property Strategist.* Leadership Publications, New York.

- *Licensing of Intellectual Property.* Jay Dratler, Jr. New York: Law Journal Seminars-Press, 1994.

- *Licensing a Strategy for Profits.* Edward P. White. U.S.A.: Licensing Executives Society (U.S.A. and Canada), Inc., 1997.

- *Technology Licensing: Corporate Strategies for Maximizing Value.* Russell L. Parr and Patrick H. Sullivan. New York: John Wiley & Sons, Inc., 1996.

- *Intellectual Property Infringement Damages: A Litigation Support Handbook.* Russell L. Parr. New York: John Wiley & Sons, Inc., 1993.

- *Valuation of Intellectual Property and Intangible Assets.* Gordon Smith and Russell Parr. New York: John Wiley & Sons, Inc., 1994, 2nd Edition.

- *Valuation of Intellectual Property* videocourse. Joseph A. Agiato and Russell L. Parr. New York: The American Institute of Certified Public Accountants, Inc., 1996.

- *Valuation of Intellectual Property Course Handbook.* Joseph A. Agiato and Russell Parr. New York: AICPA Publication, 1996.

- *Investing in Tangible Assets: Finding and Profiting From Hidden Corporate Value.* Russell L. Parr. New York: John Wiley & Sons, Inc., 1991.



*chnology.* Robert C. Megantz. New York: John Wiley & Sons, Inc., 1996.

*al Property: Legal, Business and Market Dynamics.* John W. Schlicher. .... Wiley & Sons, Inc., 1996.

## PROFESSIONAL ORGANIZATIONS

A number of national and local professional organizations provide information on intellectual property matters. The more popular national organizations include the following:

- Licensing Executives Society
- American Intellectual Property Law Association
- Intellectual Property Owners Association
- International Intellectual Property Alliance
- National Association of Plant Patent Owners
- National Council of Intellectual Property Law Associations
- Patent and Trademark Office Society
- International Trademark Association
- International Collegiate Licensing Association

The contact information for these professional organizations is included in Appendix B, "Intellectual Property Professional Associations," to this Practice Aid. The source of this data is a publication entitled *National Trade and Professional Associations of the United States,* issued by Columbia Books, Inc. It is updated annually to incorporate any changes to existing listings or the addition of new organizations.

## INTERNET SITES

A number of Internet resources are available to the analyst to access market information relating to businesses and intellectual property matters. Although it is not possible to list all potential sources of information, the following represents a sampling of Internet sites that may prove useful:

- www.census.gov (United States Census Bureau)
- www.copyright.gov (United States Copyright Office)
- www.fvgi.com (The Financial Valuation Group)
- www.hoovers.com (provides company financial data)
- www.inta.org (International Trademark Association)

- www.lesi.org (Licensing Executives Society International)

- www.royaltysource.com (Royalty Source)

- www.usa-canada.les.org (Licensing Executives Society — USA, Canada)

- www.sec.gov/edgar.shtml (U.S. Securities and Exchange Commission's searchable database of filings)

- www.uspto.gov (U.S. Patent and Trademark Office's searchable database of patents and trademarks)

- www.ggmark.com/#State_Trademark_Law (U.S. State Trademark Laws and Databases)

# APPENDIX B:
## INTELLECTUAL PROPERTY PROFESSIONAL ASSOCIATIONS (NONEXHAUSTIVE LIST)

American Intellectual Property Law Association
2001 Jefferson Davis Highway, Suite 203
Arlington, VA 22202
(703) 415-0780, Fax (703) 415-0786

American Society of Composers, Authors
  and Publishers (ASCAP)
1 Lincoln Plaza
New York, NY 10023
(212) 621-6000, Fax (212) 724-9064

Association of University Technology Managers
60 Revere Dr., Suite 500
Northbrook, IL 60062
(847) 559-0846, Fax (847) 480-9282

Business Software Alliance (USA)
1150 18th St. NW, Suite 700
Washington, D.C. 20036
(202) 872-5500, Fax (202) 872-5501

Copyright Society of the USA
352 Seventh Ave., Suite 739
New York, NY 10001
(212) 354-6401, Fax (212) 354-2847

Intellectual Property Owners Association
1255 23rd Street NW, Suite 200
Washington, DC 20037
(202) 466-2396, Fax (202) 466-2893

International Trademark Association
655 Third Avenue, 10th Floor
New York, NY 10017
(212) 768-9887, Fax (212) 768-7796

Inventors Workshop International Education
  Foundation
1029 Castillo Street
Santa Barbara, CA 93101
(805) 962-5722, Fax (805) 899-4927

Licensing Executives Society (USA & Canada)
1800 Diagonal Rd., Suite 280
Alexandria, VA 22314
(703) 836-3106, Fax (703) 836-3107

Los Angeles Copyright Society
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067

National Association of Patent Practitioners
  (NAPP)
4680-18-i Monticello Ave., PMB 101
Williamsburg, VA 23188
(800) 216-9588, Fax (757) 220-3928

National Association of Plant Patent Owners
1000 Vermont Avenue, Suite 300
Washington, DC 20005
(202) 789-2900, Fax (202) 789-1893

(*continued*)

International Collegiate Licensing Association
http://nacda.collegesports.com/nacda/
  nacda-contact.html

International Intellectual Property Alliance
1747 Pennsylvania Avenue NW, Suite 825
Washington, DC 20006
(202) 833-4198, Fax (202) 872-0546

International Licensing Industry
  Merchandisers' Association
350 5th Avenue, Suite 1408
New York, NY 10118
(212) 244-1944, Fax (212) 563-6552

National Council of Intellectual Property
  Law Associations
c/o Procter and Gamble
11520 Reed Hariman Hwy.
Cincinnati, OH 45241
(513) 634-4782

Patent and Trademark Office Society
P.O. Box 2089
Arlington, VA 22202

Patent Office Professional Association
742 S. 26th St.
Arlington, VA 22202
(703) 305-3000, Fax (703) 308-0818

# APPENDIX C:
# SUMMARY OF INTELLECTUAL
# PROPERTY CASES

| Case Name | Subject |
|---|---|
| A & L Technology v. Resound Corp., 1995 WL 415146 (N.D. Calif. 1995) | Patent |
| Allen Archery, Inc. v. Browning Mfg. Co., 898 F.2d 787 (Fed. Cir.1990) | Patent |
| Allen-Myland v. International Business Machines Corp., 770 F. Supp. 1014 (Third Cir. 1991) | Copyright |
| Alpo v. Ralston-Purina, 997 F.2d 949 (D.C. Cir. 1993) | Trademark |
| American Hoist & Derrick Co. v. Sowa & Sons, 725 F.2d 1350 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 821 (1984) | Patent |
| American Medical Systems Inc. v. Medical Engineering Corp., 794 F. Supp. 1370 (E.D. Wis. 1992) | Patent |
| American Original Corp. v. Jenkins Food Corp., 774 F.2d 459 (Fed. Cir. 1985) | Patent |
| American Sales Corp. v. Adventure Travel, Inc., 862 F.Supp. 1476 (E.D. Va. 1994) | Trade Secrets |
| Amstar Corp. v. Envirotech., 823 F.2d 1538 (Fed. Cir. 1987) | Patent |
| Andrew Corp. v. Gabriel Electronics, Inc., 785 F. Supp. 1041 (N.D. Me. 1992) | Patent |
| Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240 (Third Cir. 1983), *cert. denied*, 464 U.S. 1033 (1984) | Copyright |
| Ara Mfg. Co. v. Convertible Replacement Top Co., 377 U.S. 476 (1964) | Patent |
| Arriflex Corporation v. Aaton Cameras, Inc., 220 U.S.P.Q. 424 (S.D.N.Y. 1983) | Patent |
| Atlantic Thermoplastics Co., Inc. v. Faytex Corp., 970 F.2d 834 (Fed. Cir. 1992) | Patent |
| Austin-Western Road Machinery Co. v. Disc Grader & Plow Co., 291 F. 301 (Eighth Cir. 1923), *cert. denied*, 263 U.S. 717 (1924) | Patent |
| Bandag, Inc. v. Gerrard Tire Company, Inc., 704 F.2d 1578 (Fed. Cir. 1983) | Patent |
| BASF v. Old World Trading Co., 41 F.3d 1081 (Seventh Cir. 1994) | Patent |
| Baumstimler v. Rankin, 677 F.2d 1061 (Fifth Cir. 1982) | Patent |

(continued)

*Calculating Intellectual Property Infringement Damages*

| Case Name | Subject |
|---|---|
| Beatrice Foods Co. v. New England Printing and Litho. Co., 899 F.2d 1171 (Fed. Cir. 1990), and 923 F.2d 1576 (Fed. Cir. 1991) | Patent |
| Best Cellars, Inc. v. Wine Made Simple, Inc., LJG Wines, Inc., 320 F.Supp.2d 60 (S.D.N.Y. 2003) | Trademark |
| BIC Leisure Prod. v. Windsurfing Int'l, Inc., 850 F. Supp. 224 (S.D.N.Y. 1994) | Patent |
| Bio-Rad Laboratories Inc. v. Nicolet Instrument Corp., 739 F.2d 604 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 1038 (1984), and 807 F.2d 964 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987) | Patent |
| Big O Tire Dealers, Inc. v. The Goodyear Tire & Rubber Company, 561 F.2d 1365 (Tenth Cir. 1977) | Trademark |
| Bose Corp. v. JBL, Inc., 112 F. Supp.2d 138 (N.D. Mass. 2000) | Patent |
| Bott v. Four Star Corp., 807 F.2d 1567 (Fed. Cir. 1986) | Patent |
| Broderbund Software, Inc. v. Unison World, Inc., 648 F.Supp. 1127 (N.D. Cal. 1986) | Copyright |
| Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555 (Fed. Cir. 1992) | Patent |
| Brunswick v. U.S., 36 Fed. Cl. 204 (Fed. Cir. 1996) | Patent |
| Business Trends Analysts, Inc. v. Freetonia Group, Inc., 887 F.2d 399 (Second Cir. 1989) | Copyright |
| Carella v. Starlight Archery & Pro Line Co., 804 F.2d 135 (Fed. Cir. 1986) | Patent |
| Central Soya Co. v. Geo. A. Hormel & Co., 723 F.2d 1573 (Fed. Cir. 1983) | Patent |
| Century Wrecker Corp. v. E. R. Buske Manufacturing Co., Inc., 898 F. Supp. 1334 (N.D. Iowa 1995) | Patent |
| Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695 (Fifth Cir. 1981), *cert. denied*, 457 U.S. 1126 (1982) | Trade Dress |
| Columbia Machine & Stopper Corp. v. Adriance Machine Works, 79 F.2d 16 (Second Cir. 1935) | Patent |
| Comair Rotron, Inc. v. Nippon Densan Corp., 49 F.3d 1535 (Fed. Cir. 1995) | Patent |
| Corning Glass Works v. Sumitomo Electric USA, 868 F.2d 1251 (Fed Cir. 1989) | Patent |
| Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336 (Fed. Cir. 2001) | Patent |
| CVI/Beta Ventures, Inc. v. Tura LP, 905 F. Supp. 1171 (E.D.N.Y. 1995) | Patent |

| Case Name | Subject |
|---|---|
| Datascope Corp. v. SMEC, Inc., 879 F.2d 820 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990) | Patent |
| Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518 (1972) | Patent |
| Deere & Co. v. International Harvester Co., 710 F.2d 1551 (Fed. Cir. 1983) | Patent |
| Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320 (Fed. Cir. 1987) | Patent |
| Devex Corp. v. General Motors Corp., 494 F. Supp. 1369 (D. Del. 1980), *aff'd*, 667 F.2d 347 (Third Cir. 1981), *cert. denied*, 461 U.S. 648 (1983) | Patent |
| Digital Communications Assoc., Inc. v. Softklone D₁stributing Corp., 659 F.Supp. 449 (N.D. Ga.1987) | Copyright |
| Duraco Products, Inc. v. Joy Plastic Enterprise Ltd., 40 F.3d 1431 (Third Cir. 1994) | Trade Dress |
| Egry Register Co. v. Standard Register Co., 23 F.2d 438 (Sixth Cir. 1928) | Patent |
| Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340 (1991) | Copyright |
| Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 72 F.3d 857 (Fed. Cir. 1995) | Patent |
| Fonar Corp. v. General Elec. Co., 107 F.3d 1543 (Fed. Cir. 1997) | Patent |
| Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (Ninth Cir. 1985) | Copyright |
| Fromson v. Western Litho. Plate and Supply Co., 853 F.2d 1568 (Fed. Cir. 1988) | Patent |
| Gargoyles, Inc. v. U.S., 37 Fed. Cl. 95 (Fed. Cir. 1997) | Patent |
| General Motors Corp. v. Devex Corp., 461 U.S. 648 (1983) | Patent |
| Georgia-Pacific v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified,* 446 F.2d 295 (Second Cir. 1971), *cert. denied,* 404 U.S. 870 (1971) | Patent |
| GNB Battery Tech., Inc. v. Exide Corp., 886 F. Supp. 420 (D. Del. 1995) | Patent |
| Goodyear Tire and Rubber Co. v. Overman Cushion Tire Co., 95 F.2d 978 (Sixth Cir. 1937), *cert. denied*, 306 U.S. 665 (1939) | Patent |
| Graham v. John Deere Co. of Kansas City, 383 U.S. 1 (1966) | Patent |
| Grain Processing Corporation v. American Maize-Products Company, 185 F.3d 1341 (Fed. Cir. 1999) | Patent |
| Gustafson, Inc. v. Intersystems Indus. Products, Inc., 897 F.2d 508 (Fifth Cir. 1990) | Patent |

*(continued)*

| Case Name | Subject |
|---|---|
| Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549 (Fed. Cir. 1984) | Patent |
| Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075 (Fed. Cir. 1983). | Patent |
| Hartness International, Inc. v. Simplimatic Engineering Co., 819 F.2d 1100 (Fed. Cir. 1987) | Patent |
| Holiday Inns, Inc. v. Airport Holiday Corp., 683 F.2d 931 (Fifth Cir. 1982) | Trademark |
| Hooker Chemicals and Plastics Corp. v. U.S., 591 F.2d 652 (Ct. Cl. 1979) | Patent |
| Hughes Tool Co. v. Dresser Industries, Inc., 816 F.2d 1549 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 914 (1987) | Patent |
| Hyatt Roller Bearing Co. v. U.S., 43 F.2d 1008 (Ct. Cl. 1930) | Patent |
| In re Dahlgren Int'l, Inc., 811 F.Supp. 1180 (N.D. Texas 1992) | Patent |
| In re Mahurkar Patent Litigation, 831 F.Supp. 1354 (N.D. Ill. 1993), *aff'd*, 71 F.3d 1573 (Fed. Cir. 1995) | Patent |
| Integra Lifesciences v. Merck, 331 F.3d 860 (Fed. Cir. 2003) | Patent |
| Intergraph Corp. v. Intel, 253 F.3d 695 (Eleventh Cir. 2001) | Patent |
| International Indus., Inc. v. Warren Petroleum Corp., 248 F.2d 696 (Third Cir. 1957) | Trade Secrets |
| Jenn-Air Corp. v. Penn Ventilation Co., 394 F. Supp. 665 (E.D. Pa. 1975) | Patent |
| Johnson v. Jones,149 F.3d 494 (Sixth Cir. 1998) | Copyright |
| Kalman v. The Berlyn Corp., 914 F.2d 1473 (Fed. Cir. 1990) | Patent |
| Kaufman Co. v. Lantech, Inc., 926 F.2d 1136 (Fed. Cir. 1991) | Patent |
| Kearns v. Chrysler Corp., *32* F.3d 1541 (Fed. Cir. 1994), *cert. denied*, 115 S.Ct. 1392 (1995) | Patent |
| King Instrument Corp. v. Otari Corp., 767 F.2d 853 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986) | Patent |
| King Instruments Corp. v. Perego, 65 F.3d 941 (Fed. Cir. 1995) | Patent |
| Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc., 761 F.2d 649 (Fed. Cir. 1985), *cert. denied,* 474 U.S. 902 (1985) | Patent |
| Laitram Corp. v. Cambridge Wire Cloth Co., 785 F.2d 292 (Fourth Cir. 1986), *cert. denied*, 479 U.S. 820 (1986) | Patent |
| Lam, Inc v. Johns-Manville Corp., 718 F.2d 1056 (Fed. Cir. 1983) | Patent |
| Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734 (Fed. Cir. 1985) | Patent |

| Case Name | Subject |
| --- | --- |
| Lessona Corp. v. U.S., 599 F.2d 958 (Ct. Cl. 1981) | Patent |
| Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., 895 F.2d 1403 (Fed. Cir. 1990) | Patent |
| Livesay Window Co. v. Livesay Industries, Inc.,251 F.2d 469 (Fifth Cir. 1958) | Patent |
| Lottie Joplin Thomas Trust v. Crown Publishers, 456 F.Supp. 531 (S.D.N.Y. 1977), aff'd, 592 F.2d 651 (Second Cir. 1978) | Copyright |
| Lummus Indus., Inc. v. D.M. & E. Corp., 862 F.2d 267 (Fed. Cir. 1988) | Patent |
| McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557 (Seventh Cir. 2003) | Copyright |
| Mackie v. Rieser, 296 F.3d 909 (Ninth Cir. 2002) | Copyright |
| Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544 (Fed. Cir. 1990) | Patent |
| Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) | Patent |
| Marsh-McBirney, Inc. v. Montedoro-Whitney Corp., 882 F.2d 498 (Fed. Cir. 1989) | Patent |
| Mathis v. Spears, 857 F.2d 749 (Fed. Cir. 1988) | Patent |
| Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119 (Fed. Cir. 2003) | Patent |
| Micro Motion, Inc. v. Exac Corp., 761 F.Supp. 1420 (N.D. Cal. 1991) | Patent |
| Midgard Corp. v. Todd, 107 F.3d 880 (Tenth Cir. 1997) (unpublished opinion) | Trade Secrets |
| Milgo Electronics Corp. v. United Business Communications, Inc., 623 F.2d 645 (Tenth Cir. 1980), cert. denied, 449 U.S. 1066 (1980) | Patent |
| Minco, Inc. v. Combustion Engineering, Inc., 903 F.Supp. 1204 (E.D. Tenn. 1995), aff'd, 95 F.3d 1109 (Fed. Cir. 1996) | Patent |
| Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559 (Fed. Cir. 1992) | Patent |
| Mobil Oil Corp. v. Amoco Chemicals Corp., 915 F.Supp. 1333 (D. Del. 1995) | Patent |
| Montgomery v. Noga, 168 F.3d 1282 (Eleventh Cir. 1999) | Copyright |
| Nickson Industries Inc. v. Rot Mfg. Co. Ltd., 847 F.2d 795 (Fed. Cir. 1988) | Patent |
| Nintendo of America, Inc. v. Dragon Pac. Int'l, 40 F.3d 1007 (Ninth Cir. 1994), cert. denied, 515 U.S. 1107 (1995) | Trademark |
| Northlake Marketing & Supply, Inc. v. Glaverbel, 72 F. Supp.2d 893 (N.D. Ill. 1999) | Patent |

(continued)

| Case Name | Subject |
|---|---|
| On Davis v. The Gap, Inc., 246 F.3d 152 (Second Cir. 2001) | Copyright |
| Orthman Mfg. Inc. v. Chromalloy American Corp., 512 F.Supp. 1284 (C.D. Ill. 1981) | Patent |
| Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 564 F.Supp. 1358 (D. Del. 1983) | Patent |
| Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211 (Fed. Cir. 1995) | Patent |
| Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (Sixth Cir. 1978) | Patent |
| Paper Converting Mach. Co. v. Magna-Graphics Corp., 745 F.2d 11 (Fed. Cir. 1984) | Patent |
| PepsiCo, Inc. v. William E. Redmond, Jr., 1996 WL 3965 (N.D. Ill. 1996) | Trade Secrets |
| Pfizer, Inc v. International Rectifier Corp., 218 U.S.P.Q. 586 (C.D. Cal. 1983) | Patent |
| Pitcairn v. U.S., 547 F.2d 1106 (Ct. Cl. 1976) | Patent |
| Playboy Enterprises, Inc v. P.K. Sorren Export Co., 546 F. Supp. 987 (D.C. Fla. 1982) | Trademark |
| Polaroid Corp. v. Eastman Kodak Co., 16 U.S.P.Q.2d. 1481 (N.D. Mass. 1990), *aff'd*, 17 U.S. P.Q.2d 1711 (D. Mass. 1991) | Patent |
| Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (Second Cir. 1961) | Trademark |
| Qualitex Co., v. Jacobson Products Co., Inc., 514 U.S. 159 (1995) | Trademark |
| Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554 (Fed. Cir. 1986) | Patent |
| Railroad Dynamics, Inc. v. A. Stucki Co., 727 F.2d 1506 (Fed. Cir. 1984), *cert. denied*, 469 U.S. 871 (1984) | Patent |
| Richardson v. Suzuki Motor Co., 868 F.2d 1226 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 853 (1989) | Patent |
| Ristvedt-Johnson, Inc. v. Brandt, Inc., 805 F. Supp. 557 (N.D. Ill. 1992) | Patent |
| Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 867 (1995) | Patent |
| Rockwood v. General Fire Extinguisher Co., 37 F. 2d 62 (Second Cir. 1930) | Patent |
| Rogers v. Koons, 960 F.2d 301 (Second Cir. 1992) | Copyright |
| Rude v. Westcott, 130 U.S. 152 (1889) | Patent |
| Ryco Inc v. Ag-Bag Corp., 857 F.2d 1418 (Fed. Cir. 1988) | Patent |
| Schneider (Europe) AG v SciMed Life Systems, Inc., 852 F. Supp. 813 (D. Minn. 1994), *aff'd*, 60 F.2d 839 (Fed. Cir. 1995) | Patent |

*Appendix C: Summary of Intellectual Property Cases*

| Case Name | Subject |
|---|---|
| Scott Paper Co. v. Moore Business Forms, Inc., 594 F. Supp. 1051 (D. Del. 1984) | Patent |
| Scripto-Tokai Corp. v. Gillette Co., 788 F. Supp. 439 (C.D. Cal. 1992) | Patent |
| Service Recorder Co. v. Routzahn, 24 F.2d 875 (N.D. Ohio 1927) | Patent |
| Shamrock Technologies Inc. v. Medical Sterilization Inc., 808 F.Supp. 932 (E.D.N.Y. 1992) | Patent |
| Shiley, Inc. v. Bentley Laboratories, Inc., 225 U.S.P.Q. 1013 (C.D. Cal. 1985), aff'd, 794 F.2d 1561 (Fed. Cir. 1986) | Patent |
| Shurgard Storage Centers, Inc. v. Safeguard Self Storage, 119 F.Supp. 2d 1121 (W.D. Wash. 2000) | Trade Secrets |
| Slimfold Mfg. Co. v. Kinkead Indus. Inc., 932 F.2d 1453 (Fed. Cir. 1991) | Patent |
| SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161 (Fed. Cir. 1991) | Patent |
| Snellman v. Ricoh, Co., Ltd., 862 F.2d 283 (Fed. Cir. 1988), cert. denied, 491 U.S. 910 (1989) | Patent |
| Standard Havens Prods., Inc. v. Genco Indus., Inc., 953 F.2d 1360 (Fed. Cir. 1991) | Patent |
| Standard Manufacturing Co., Inc. and DBP, Ltd. v. United States, 42 Fed.Cl. 748 | Patent |
| Stanfield v. Osborne Industries, Inc., 52 F.3d 867 (Tenth Cir. 1995) | Patent |
| State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990) | Patent |
| Steiner Corp. v. Benninghoff, 5 F.Supp. 2d 1117 (D. Nev. 1998) | Valuation |
| Stickle v. Heublein, Inc., 716 F.2d 1550 (Fed. Cir. 1983) | Patent |
| Stryker Corp. v. Intermedics Orthopedics, Inc., 891 F.Supp. 751 (E.D.N.Y. 1995) | Patent |
| Stuart Hall Co. v. Ampad Corp., 51 F.3d 780 (Eighth Cir. 1995) | Trade Dress |
| Studiengesellschaft Kohle, v. Dart Industries, Inc., 862 F.2d 1564 (Fed. Cir. 1988) | Patent |
| Sun Studs, Inc. v. ATA Equipment Leasing, Inc., 872 F.2d 978 (Fed. Cir. 1989) | Patent |
| Taylor v. Meirick, 712 F.2d 1112 (Seventh Cir. 1983) | Copyright |
| Tektronix, Inc. v. U.S., 552 F.2d 343 (Ct. Cl. 1977) | Patent |
| Tights, Inc. v. Kayser-Roth Corp., 442 F. Supp. 159 (M.D.N.C. 1977) | Patent |
| Total Containment, Inc. v. Environ Products, Inc., 921 F. Supp. 1355 (E.D. Pa. 1995), aff'd, 106 F.3d 427 (Fed. Cir. 1997) | Patent |

*(continued)*

*85*

*Calculating Intellectual Property Infringement Damages*

| Case Name | Subject |
|---|---|
| Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc., 750 F.2d 1552 (Fed. Cir. 1984) | Patent |
| Trell v. Marlee Elects. Corp., 912 F.2d 1443 (Fed. Cir. 1990) | Patent |
| Trio Process Corp. v. L. Goldsteins Sons, Inc., 533 F.2d 126 (Third Cir. 1976) | Patent |
| TWM Manufacturing Co., Inc v. Dura Corp., 789 F.2d 895 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 852 (1986) | Patent |
| Two Pesos Inc. v. Taco Cabana Inc., 505 U.S. 763 (1992) | Trade Dress |
| U-Haul v. Jartran, 793 F.2d 1034 (Ninth Cir. 1986) | Trademark |
| Underwater Devices Inc. v. Morrison-Knudsen Co., 717 F.2d 1380 (Fed. Cir. 1983) | Patent |
| Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540 (Fed. Cir. 1991) | Patent |
| Unisplay S.A. v. American Electronic Sign Co., 69 F.3d 512 (Fed. Cir. 1995) | Patent |
| Wang Laboratories Inc. v. Mitsubishi Electronics America, Inc., 860 F.Supp. 1448 (C.D. Cal. 1993) | Patent |
| Water Technologies Corp. v. Calco Ltd., 850 F.2d 660 (Fed. Cir. 1988), *cert. denied*, 488 U.S. 968 (1988) | Patent |
| Weinar v. Rallform Inc., 744 F.2d 797 (Fed. Cir. 1984), *cert. denied*, 470 U.S. 1084 (1985) | Patent |
| Whelan Assoc., Inc. v. Jaslow Dental Lab. Inc., 797 F.2d 1222 (Third Cir. 1986) | Copyright |
| Yale Lock Mfg. Co. v. Sargent, 117 U.S. 536 (1886) | Patent |
| Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268 (Fed. Cir. 1985) | Patent |
| Ziggity Systems, Inc. v. Val Watering Systems, 769 F.Supp. 752 (E.D. Pa. 1990) | Patent |
| Zygo Corp. v. Wyko Corp., 79 F.3d 1563 (Fed. Cir. 1996) | Patent |

AICPA Member and
Public Information:
**www.aicpa.org**

AICPA Online Store:
**www.cpa2biz.com**

*ISO Certified*

055300