IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRESENIUS MEDICAL CARE HOLDINGS, INC., et al., | No. C 03-1431 SBA |
| Plaintiffs, | **ORDER** |
| v. | **[Docket No. 446]** |
| BAXTER INTERNATIONAL, INC., et al., | |
| Defendants. | |

This matter comes before the Court on Defendants Baxter International, Inc. and Baxter Healthcare Corporation's (collectively, "Defendants" or "Baxter") Motion to Bar Fresenius' Proffered Damages Expert Professor Rubinfeld. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby DENIES Baxter's Motion to Bar Fresenius' Proffered Damages Expert Professor Rubinfeld [Docket No. 446].

**BACKGROUND**

Plaintiffs and counter-defendants Fresenius USA, Inc. and Fresenius Medical Care Holdings, Inc. (collectively "Fresenius") initiated this patent suit on April 4, 2003 by filing a Complaint for Declaratory Judgment of Non-infringement and Invalidity against defendants and counter-plaintiffs Baxter International, Inc. and Baxter Healthcare Corporation (collectively "Baxter"). Fresenius cited five patents in its complaint: (1) U.S. Patent No. 5,247,434 ("'434 Patent"); (2) U.S. Patent No. 5,326,476 ("'476 Patent"); (3) U.S. Patent No. 6,284,131 B1 ("'131 Patent"); (4) U.S. Patent No. 5,486,286 ("'286 Patent"); and (5) U.S. Patent No. 5,744,027 ("'027 Patent") (collectively

"patents-in-suit").

On May 14, 2003, Baxter answered and counterclaimed that Fresenius' 2008H and/or 2008K hemodialysis machines infringe four of the five patents. On October 20, 2003, Baxter amended its answer and counterclaims to assert infringement of the '286 Patent.

On February 1, 2006, Fresenius submitted the Rebuttal Expert Report of Daniel L. Rubinfeld Regarding Damages ("Rebuttal Expert Report").

As set forth in his curriculum vitae, Dr. Rubinfeld is currently a Professor of Law and Economics at University of California, Berkeley. Keller Decl. at Ex. 2. He received a Bachelor of Arts degree from Princeton University in 1967, a Masters degree in Economics from Massachusetts Institute of Technology ("MIT") in 1968, and a Ph.D. in Economics from MIT in 1972. *Id.* From June 1997 through December 1998, Dr. Rubinfeld served as Deputy Assistant Attorney General at the Antitrust Division of the United States Department of Justice. Kelleher Decl. at Ex. 1. Additionally, Dr. Rubinfeld has taught at the University of Michigan, and has been a visiting professor at the law schools of Stanford University, the University of Geneva, the University of Virginia, and New York University. *Id.* He is the author of two textbooks, *Microeconomics* and *Econometric Models and Economic Forecasts*. *Id.* He has also served as a lecturer for the Federal Judicial Center on the use of statistical methods by the courts. *Id.*

Dr. Rubinfeld's Rebuttal Expert Report is intended to rebut the report of Baxter's expert, Mr. R. Bruce Den Uyl, who has opined that Baxter is entitled to a reasonable royalty of $86 million. In his Rebuttal Expert Report, Dr. Rubinfeld provides: (1) an opinion that Fresenius' success in the marketplace is not related to the patented technology; (2) an opinion that there is no direct relationship between the sales of Fresenius' 2008K and the sales of its disposables; (3) an opinion that the sales of Fresenius' 2008K do not promote hemodialysis treatment sales; (4) an opinion that a reasonable royalty is approximately $2 million to $4 million, based on several different likely "hypothetical negotiation" scenarios between either Althin Medical, AB ("Althin")[1] and Fresenius or Baxter and Fresenius.

On March 7, 2006, Baxter filed the instant Motion to Bar Fresenius' Proffered Damages Expert

---

[1] Althin was the original owner of all of the patents-in-suit except the '131 Patent. Althin was acquired by Baxter in March 2000.

2

Professor Rubinfeld (hereinafter referred to as Baxter's "Motion to Exclude").  Baxter's Motion to Exclude is premised on Federal Rule of Evidence 702.

## LEGAL STANDARD

Expert testimony is admissible pursuant to the Federal Rules of Evidence, primarily Rule 702. *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 589 (1993).  Under *Daubert*, the district court acts as a "gatekeeper," excluding "junk science" that does not meet the standards of reliability required under Rule 702.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Kennedy v. Collagen Corp*., 161 F.3d 1226, 1229-30 (9th Cir. 1998).  The trial court accomplishes this goal through a preliminary determination that the proffered evidence is both relevant and reliable.  *Daubert*, 509 U.S. at 589-95.

Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science.  *Id.* at 592-95.  In *Daubert*, the Supreme Court gave a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be and/or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94.

The Ninth Circuit has explained that if an expert did not conduct his or her own research, independent of the litigation, on the subject of the testimony, the district court must determine whether there exists any "objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("*Daubert II*").  An expert may demonstrate the scientific validity of a theory or technique by showing that "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id.* at 1318.  Alternatively, testifying experts may also show the validity of their theory by explaining "precisely how [the experts] went about reaching their conclusions and pointing to some objective source – a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like – to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

The proponent of the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence. *Butler v. Home Depot, Inc.*, 984 F.Supp. 1257, 1260 (N.D. Cal. 1997). The Court's gatekeeper role under *Daubert* requires the Court to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93.

A trial court has broad latitude in determining whether an expert's testimony is reliable and also in deciding how to determine the testimony's reliability. *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000). However, the Court's inquiry must "focus[] solely on [the] principles and methodology, not on the conclusions that they generate." *United States v. Prime*, 431 F.3d 1147, 1153 (9th Cir. 2005). Similarly, the trial court is not "to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) (citations omitted).

## ANALYSIS

In its Motion to Exclude, Baxter offers the following bases for excluding Dr. Rubinfeld's testimony: (1) he is not sufficiently qualified to serve as an expert on reasonable royalties; (2) his proffered opinion testimony regarding the hypothetical negotiations between Althin and Fresenius is "internally contradictory" and contrary to Federal Circuit law; (3) his purportedly proposed "ceiling" on reasonable royalty damages is contrary to law; (4) his apportionment between the patented and unpatented features of the 2008K is contrary to law; and (5) his "causation" test for including derivative sales of disposables in the royalty base is contrary to law.[2]

---

[2]Baxter also points out, in a footnote, that Dr. Rubinfeld has failed to disclose the compensation he is to be paid for his testimony, as required by Federal Rule of Civil Procedure 26(a). Although Baxter is correct that this information is not contained in the Rebuttal Expert Report, this is not a basis for excluding Dr. Rubinfeld's testimony. Pursuant to Federal Rule of Civil Procedure 37, "If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions. *The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the*

**A.      Expert Qualifications**

As a preliminary matter, this Court must first determine whether Dr. Rubinfeld is a qualified expert before his testimony can be deemed admissible. *See* Fed. R. Evid. 104(a) ("Preliminary questions concerning the qualifications of a person to be a witness . . . shall be determined by the court[.]"). Rule 702 requires that Dr. Rubinfeld be "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702.

Here, Baxter contends that Dr. Rubinfeld is not qualified to offer expert opinion testimony on the issue of reasonable royalty patent damages. To support its assertion that Dr. Rubinfeld should be precluded from testifying, Baxter primarily relies on two Federal Circuit cases: *State Contracting & Eng'g Corp. v. Condotte America Inc.*, 346 F.3d 1057, 1073 (Fed.Cir. 2003) (proffered expert excluded because "he had no experience in placing a value on a patent and did not have any knowledge regarding reasonable royalties" for specific patents) and *Abbott Labs. v. Brennan*, 952 F.2d 1346, 1351-52 (Fed.Cir. 1991) (proffered expert excluded because he had no experience analyzing the market for a medical device and admitted that he was "not an expert on patent royalties").

Baxter's reliance on *State Contracting* and *Condotte* is misplaced, however. In contrast to the proffered experts discussed in *State Contracting* or *Abbott Labs,* Dr. Rubinfeld has extensive training, education, and professional experience in the area of valuing intellectual property, including patents. Rubinfeld Decl. at ¶¶ 3, 6. He also has a considerable amount of professional experience in analyzing

---

*disclosure without court action*." Fed. R. Civ. P. 37 (emphasis added). The instant Motion was not filed pursuant to Federal Rule of Civil Procedure 37 and Baxter has not certified to the Court that it has attempted to confer with Fresenius regarding its failure to disclose all of the requisite information. However, since this information is required, Fresenius is HEREBY ORDERED to provide the information regarding Dr. Rubinfeld's compensation to Baxter within seven (7) days of this Order.

Additionally, Baxter also argues in its Motion that Dr. Rubinfeld should be barred from testifying that Baxter has "admitted" that it did not lose profits. *See* Kelleher Decl. at Ex. 1 (Rubinfeld Expert Report at p. 20) ("Baxter's Admission That It Did Not Lose Profits Indicates That Fresenius' Success In The Market Is Not Due To The Patents-In-Suit"). Since Baxter has not made this admission, but has merely elected not to pursue this legal theory in order to streamline the issues for trial, Baxter is correct that this testimony is improper and therefore it is ORDERED THAT Dr. Rubinfeld may not to state that Baxter has made such an "admission" at trial. Further, Baxter is also correct that Dr. Rubinfeld's testimony regarding another theory that Baxter is not pursuing – *i.e.* royalty on each use of the 2008K machines in Fresenius' clinics – is irrelevant. Since Baxter has conceded that it is not relying on this theory, both parties are hereby precluded from providing testimony on this subject at trial. As set forth below, however, the remainder of Dr. Rubinfeld's Rebuttal Expert Report is relevant and admissible.

5

economic issues relating to intellectual property licenses. *Id.* In fact, Dr. Rubinfeld served as the chief economist in the Antitrust Division of the Justice Department and evaluated the market impacts of patents, licenses, and royalties. *Id.* ¶ 4.

Dr. Rubinfeld has also previously been qualified to testify in federal court as an expert in patent cases. *Id.* ¶ 7. In particular, he has been qualified to provide expert testimony on lost profits, unjust enrichment patent damages, and intellectual property damages in trade secret litigation. *Id.* ¶¶ 7, 10. Further, he has provided expert testimony relating to the market analysis of medical devices. *Id.* ¶ 10. Additionally, in response to Baxter's assertion that Dr. Rubinfeld has never before testified on the subject of reasonable royalties, Dr. Rubinfeld points out that he proffered expert testimony on the relationship between unjust enrichment *and* reasonable royalties in the case of *University of Colorado Foundation, Inc. v. American Cyanamid Co.* in the United States District Court, District of Colorado. *Id.* at ¶ 7. He also testified on the subject of reasonable royalties in *Micro Motion Inc. v. Exac* and *Modine Mfg. Co. v. Allen Group*, two cases in the United States District Court, Northern District of California

Based on Dr. Rubinfeld's background and education, as well as his extensive and specific experience with intellectual property and economics, this Court deems Dr. Rubinfeld qualified to present opinion testimony on the subject matter of damages.

**B.     Dr. Rubinfeld's Methodology Regarding the "Hypothetical Negotiations"**

Baxter's assertion that the Court should exclude Dr. Rubinfeld's testimony regarding reasonable royalty damages as "contradictory," "unreliable," and "contrary to law" is also unfounded.

Both parties agree that, upon a finding of infringement, Baxter is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284; *see also Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) (holding that when actual damages cannot be adequately proved, a reasonable royalty may be employed), *overruled on other grounds in Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004). "A reasonable royalty is the amount that 'a person, desiring to manufacture[, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make[, use, or] sell the patented article, in the

market, at a reasonable profit.'" *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984). When an established royalty does not exist, a court may determine a reasonable royalty based on "hypothetical negotiations between willing licensor and willing licensee." *Fromson*, 853 F.2d at 1574; *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) (quoting *Panduit Corp. v. Stahlin Bros. Fibre Works Ins.*, 575 F.2d 1152, 1158 (6th Cir. 1978). The first step "in a reasonable royalty calculation is to ascertain the date on which the hypothetical negotiation in advance of infringement would have occurred." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F.Supp.2d 459, 464 (Fed. Cir. 2005) (citation omitted). To prevent the hypothetical from lapsing into pure speculation, the parties must produce "sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999).

Baxter claims that the methodology Dr. Rubinfeld employed to determine a reasonable royalty is not reliable because his opinion rests on principles that are not legally acceptable. Specifically, Baxter argues that Dr. Rubinfeld's opinions about the crucial features of the hypothetical negotiation – *i.e.*, when it would happen and who would be there – are contrary to law.

In his own expert report, Baxter's expert, Mr. Den Uly, has opined that the hypothetical negotiation would have taken place between Baxter and Fresenius in August 2000. In his Rebuttal Expert Report, Dr. Rubinfeld also provides an analysis of a hypothetical negotiation between Baxter and Fresenius in August 2000. Keller Decl. at Ex. 1 (Rebuttal Expert Report at ¶ 119). However, in addition, he poses an alternate scenario: a hypothetical negotiation between Althin and Fresenius in December 1998. *See id.* at Ex. 1 (Rebuttal Expert Report at ¶¶ 115-118). It is the propriety of the December 1998 date that Baxter disputes.

Baxter advances three arguments to show that Dr. Rubinfeld's opinion is contrary to law, and therefore inadmissible under *Daubert*: (1) Dr. Rubinfeld's proposed December 1998 date is improper because, under *Wang Labs Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993), notice to an infringer does not trigger the hypothetical negotiation date; (2) even if notice could trigger a hypothetical negotiation between the parties, Fresenius was engaged in development activities in 1998, which are non-infringing as a matter of law; and (3) Dr. Rubinfeld's selection of the 1998 negotiation date is

7

inconsistent with his opinion regarding the date damages accrued. All of Baxter's arguments are without merit.

Contrary to Baxter's assertions, Dr. Rubinfeld's selection of the 1998 negotiation date does not violate *Wang* or any other Federal Circuit precedent. In his Rebuttal Expert Report, Dr. Rubinfeld explains that he selected the December 1998 date because it is the date that Althin first notified Fresenius that it intended to enforce its rights in the '434 Patent and demanded that Fresenius obtain a license. *Id.* at Ex. 2. As such, Dr. Rubinfeld's opinion is not based on mere speculation or "fantasy," as Baxter contends, but firmly rooted in the applicable facts of the case. Further, while Baxter attempts to persuade the Court that *Wang* stands for the proposition that "notice" of infringement can never trigger a hypothetical negotiation date, this is not the holding of *Wang*. Instead, *Wang* stands for the proposition that a court should look to the earliest date of infringement, which is often the date that the patent issued. *See Wang*, 993 F.2d at 870. In fact, in *Wang*, the Federal Circuit rejected the notice date, *i.e.* 1990, only because it *post*-dated the issuance of the patent, which was 1987, *as well as* the first date of infringing sales. *Id.* As such, the *earlier* date was used. *Id.* In the instant case, the '434 Patent issued on September 21, 1993, and, for the purposes of the instant Motion, the parties agree that the first sales of the 2008K occurred on or about August 2000. As such, application of the December 1998 date, which post-dates the date the patent issued but precedes the first date of infringing sales, is not inappropriate under the law.[3] The mere fact that it is an earlier date than the date Baxter has selected does not make it *per se* unreliable.

Further, while Baxter attempts to cloud the issue by arguing that Fresenius was not liable for infringement during 1998 because it had not yet received approval from the FDA and thus was protected

---

[3] Nor does *Applied Medical Resources Corp. v. United States Surgical Corp.*, 435 F.3d 1356 (Fed. Cir. 2006) eviscerate the validity of Dr. Rubinfeld's analysis. In *Applied Medical*, the Federal Circuit held that an earlier negotiation date relating to a *different infringing product* could not be used in evaluating the reasonable royalty to be employed in a subsequent case between the same parties. In this case, the infringing product that prompted the December 1998 letter from Althin is the *same* product that Baxter contends would have been the subject of the negotiations in August 2000. For this reason, *Applied Medical* is inapposite.

8

by the safe harbor provision of 35 U.S.C. § 271(e)(1),[4] this argument is irrelevant. The Federal Circuit has repeatedly held that a hypothetical negotiation can take place at a time *before* infringement begins, so long as the time period reasonably *relates to* the infringement in question. *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir.1983)); *see Applied Medical Resources Corp. v. United States Surgical Corp.*, 435 F.3d at 1361; s*ee also Interactive Pictures Cor. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (holding that it was permissible for jury to consider a business plan prepared months before infringement began and noting that the "consideration of a hypothetical negotiation necessarily involves an element of approximation and uncertainty."). Regardless of the fact that Fresenius may have been waiting for FDA approval of the 2008K at the time it received notice from Althin, the patent-holder, it is neither unreasonable nor contrary to law to assume that – in a hypothetical world – Fresenius could have initiated its licensing negotiations with Althin at some point in December 1998 or thereafter. This is particularly true given the fact that, as Fresenius points out, the FDA does not tell companies when approval will be granted.

Baxter is also incorrect that Dr. Rubinfeld's Rebuttal Expert Report is "internally inconsistent" because it adopts the damages period set forth in Mr. Den Uyl's report, which is August 2000, rather than awarding damages to Baxter in 1998. In fact, Baxter goes so far as to childishly deride Fresenius in its Reply brief for "failing" to produce evidence of its own infringement. *See* Reply at 3 ("Fresenius is in a better position to know whether it was infringing. If it was doing do in December 1998, why hasn't Fresenius presented this evidence to the Court?"). Baxter, of course, conveniently overlooks the fact that the burden of proving infringement falls on Baxter, not Fresenius. It is also Baxter, and not Fresenius, who bears the burden of proving damages. *See Lindemann Maschinenfabrik v. American*

---

[4]35 U.S.C. § 271(e)(1) provides:

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use or sale of drugs  or veterinary biological products.

35 U.S.C. § 271(e)(1).

*Hoist & Derrick Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990). Given these two obvious points, it is quite clear that Dr. Rubinfeld's Rebuttal Expert Report is intended to provide a meaningful analysis and *rebuttal* of Mr. Den Uyl's opinion that damages accrued in August 2000. Further, as Fresenius adeptly points out, to the extent that any infringing activities took place prior to August 2000, such as offers of sale, those infringing activities are already accounted for in the royalty applied to the revenue received after the sales were consummated. As such, the mere fact that Dr. Rubinfeld has offered an opinion on the August 2000 damages period does not make his report "internally inconsistent" or legally flawed.

**C.    Dr. Rubinfeld's Methodology Regarding the Limitations on Reasonable Royalty Damages**

Next, Baxter wrongly contends that Dr. Rubinfeld has asserted that there is an "absolute ceiling" on the reasonable royalty damages Baxter is permitted to recover. However, as Fresenius has shown in its Opposition, Dr. Rubinfeld does not propose the imposition of a "ceiling" on Baxter's damages. Instead, he sets forth different methods for calculating a "reasonable" royalty and, as part of this analysis, expresses an opinion that his calculations can be used as "reasonable benchmarks" for the damages to be awarded. Further, Fresenius argues that the methodology Dr. Rubinfeld has employed is an "analytical approach" that has been expressly approved by the American Institute of Certified Public Accountants ("AICPA"). The AICPA's Practice Aid, entitled "Calculating Intellectual Property Damages," describes the method as follows:

> Another measurement methodology is the analytical method. The royalty calculation under this method is based on the infringer's own internal profit projection for the infringing item at the time the infringement began. The analytical method is based on the premise that any rate of return in excess of a normal rate of return can be attributed to the patent. This method takes the profits of the infringer, subtracts the infringer's normal profit, and awards some portion of the remainder to the patent owner.

Opp. at Ex. B.[5]   Here, Dr. Rubinfeld opines that: "[a] *reasonable* estimate of damages . . . [is

---

[5] In its Reply brief, Baxter sets forth two new arguments as to why Dr. Rubinfeld has not followed the "analytic method" set forth in the AICPA's Practice Aid: (1) he uses a "contribution margin" rather than the projected gross margin set forth in an internal Fresenius document; and (2) he states that he is using the 2008H as the "next-best alternative" instead of stating that the 2008H provides the "normal rate of return." In support of the former, Baxter relies on *TWM Mfg. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986). However, *TWM* does not convincingly show that Dr. Rubinfeld's Rebuttal Expert Report impermissibly deviates from the analytical method in a way that is contrary to law. Rather, *TWM* merely holds that a special master did not clearly err by opting to rely on an internal

10

determined] by apportioning the incremental profit from infringement between the licensor and the licensee. In particular, the incremental profit difference between the 2008H and the 2008K." Kelleher Decl. at Ex. 1 (Rebuttal Expert Report ¶ 27) (emphasis in original). Dr. Rubinfeld then proposes three different scenarios: one where it is assumed that the patented touch feature is responsible for 100% of the additional profit; a second scenario that assumes that 50% of the additional profit is attributable to the patented feature; and a third scenario that attributes 25% of the additional profit to the touch screen. *Id.* at Ex. 1 (Rebuttal Expert Report at ¶ 174). The three scenarios provide for royalties in the amount of approximately $1.1 million, $2.2 million, and $4.3 million, respectively. *Id.*[6]

While Baxter hotly debates whether the 2008H model is, in fact, a viable alternative to the 2008K, this is not an issue for the Court to determine under a *Daubert* review. Whether there is a "noninfringing substitute is a question of fact." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed.Cir. 1992); *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 788 F.2d 1554, 1556 (Fed. Cir. 1986). Rhetoric aside, Baxter has not shown that Dr. Rubinfeld's reliance on the 2008H is utterly inappropriate or otherwise divorced from the facts of this case. In fact, Dr. Rubinfeld's Rebuttal Expert Report clearly sets forth the facts he believes support his conclusion that the 2008H can be compared to the 2008K for the purposes of his economic analysis. *See, e.g.,* Kelleher Decl. at Ex. 1 (Rebuttal Expert Report at ¶¶ 144, 146). Thus, all that Baxter has shown is that, under Baxter's interpretation of the facts, Dr. Rubinfeld's testimony regarding the 2008K may not be convincing. However, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony." *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). As such, Baxter has not convincingly established that this is a valid basis for excluding Dr. Rubinfeld as an expert.

---

memorandum regarding projected profits instead of adopting the expert's testimony. *Id.* As to Baxter's second argument, this amounts to mere quibbling over whether Dr. Rubinfeld has used precise enough terminology. Baxter's concerns about Dr. Rubinfeld's reliance on the 2008H as a "non-infringing substitute" is addressed separately below.

[6]Additionally, Baxter is also incorrect that Dr. Rubinfeld is suggesting that Fresenius' "design-around cost" imposes a "ceiling" on Baxter's damages. Since Dr. Rubinfeld has estimated that the design-around cost would be approximately $200,000 to $1,000,000, and elsewhere opines in his report that reasonable damages could amount to over $4 million, it is clear that Dr. Rubinfeld is not proposing that Baxter's potential recovery must be limited to the design-around cost.

11

### D. Dr. Rubinfeld's Apportionment of Incremental Profit Between Patented and Unpatented Features

Baxter has also not shown that Dr. Rubinfeld should be barred from providing testimony that apportions damages between the patented and unpatented features of the 2008K. In support of its argument that this testimony is impermissible, Baxter relies on *Radio Steel v. MTD Products*, 788 F.2d 1554, 1557 (Fed. Cir. 1986)[7] and *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1136 (S.D.N.Y. 1970). Baxter has not shown, however, how Dr. Rubinfeld's testimony actually violates the general principles pronounced in *Radio Steel*. Unlike the defendant in *Radio Steel*, Dr. Rubinfeld is not making a vague assertion that a certain royalty is "unreasonable" merely because Baxter's patent is not sufficiently "novel." *See id.* Rather, Fresenius has shown that Dr. Rubinfeld is providing testimony that may be pertinent to the "entire market value rule," which requires a patentee owning an "improvement patent," such as the '434 Patent, to show that the entire value of the whole machine, as a marketable article, was properly and legally attributable to the patented feature. *Rite-Hite Corp. v. Kelley Co., Inc.*,m 56 F.3d 1538, 1549 (Fed. Cir. 1995).

Additionally, the district court in the seminal case of *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970), specifically found that "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements" is a relevant factor in determining the amount of a reasonable royalty. *Id.* at 1120. Tellingly, Baxter utterly ignores this holding of *Georgia-Pacific* in its Reply brief.

### E. Dr. Rubinfeld's Exclusion of Lost Sales for Disposables

Finally, Baxter has not shown that Dr. Rubinfeld should be barred from testifying that the derivative sales of certain unpatented disposables[8] may be excluded from the royalty base. Baxter cites numerous cases – such as *Georgia-Pacific*, *Juicy Whip Inc. v. Orange Bang Inc.*, 382 F.3d 1367, 1371

---

[7]In *Radio Steel,* an infringer argued that the damages award was excessive because the patented feature only added minimal benefit to the entire apparatus, a wheelbarrow. *Id.* at 1557. The *Radio Steel* court rejected this argument and found that "[i]t is the totality of all the elements and their interaction with each other which is the inventor's contribution to the . . . [wheelbarrow's] making." *Id.*

[8]The term "disposables" includes medical products such as dialyzers, needles, and bloodlines which are used in the hemodialysis process.

12

(Fed. Cir. 2004), *Micro Chemical v. Lextron*, 317 F.3d 1387, 1390 ( Fed. Cir. 2003), *Trans-World Mfg. Corp. v. Al Nyman Sons, Inc.*, 750 F.2d 1552, 1567 (Fed. Cir. 1984), *Deere & Co. v. Int's Harvester Co.*, 70 F.2d 1551, 1555 (Fed. Cir. 1983) – that stand for the general proposition that a hypothetical license negotiation must take into account "[t]he effect of selling the patented specialty in promoting the sales of other products of the licensee[,]" including the sales of physically separated non-patented articles. *See Georgia-Pacific*, 318 F. Supp. at 1120; *Juicy Whip*, 382 F.3d at 1371. The appropriate test to be employed is known as the "entire market value rule." *Juicy Whip*, 383 F.3d at 1371. Baxter has not shown, however, how Dr. Rubinfeld's analysis or methodology is legally inconsistent with the general principles enunciated in these cases. Baxter argues only that Dr. Rubinfeld's conclusions are unacceptable because "ample evidence exists . . . for the jury to include derivative sales in a royalty" and because Dr. Rubinfeld has opined that "there is no clear causal relationship" between the sales of the 2008K machines and the sales of disposables. *See* Kelleher Decl. at Ex. 1 (Rebuttal Expert Report at ¶ 71).

As Fresenius points out, all of the cases Baxter has cited relate to the factual evidentiary burdens that must be met by a patent holder before unpatented sales are included in a royalty base or royalty rate. *See* Opp. at 17. In the instant case, Dr. Rubinfeld is offering expert testimony intended to show that Baxter's evidentiary burden is not supported by the applicable facts. Kelleher Decl. at Ex. 1 (Rebuttal Expert Report at ¶¶ 71-101. To the extent that Dr. Rubinfeld refers to a "causal" relationship between 2008K sales and the sales of derivatives, it is clear that he is merely *rebutting* Mr. Den Uyl's opinion that one exists. He is not, as Baxter contends, attempting to change the evidentiary burden itself. In fact, the Expert Rebuttal Report cites directly to *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538 (Fed. Cir. 1995), one of the leading cases on this issue. Further, Baxter has not produced *any* credible argument that Mr. Rubinfeld's economic analysis of the relationship between the sales of disposables and the sales of 2008K machines is otherwise scientifically unsound.[9]

While Baxter may take issue with Dr. Rubinfeld's ultimate conclusions, this is not the

---

[9]Moreover, as Fresenius points out in its brief, the Federal Circuit has expressly held that parties are entitled to proffer "competing" expert testimony on this issue, and that the testimony may be based on the expert's own view of the disputed facts. *Micro Chemical, Inc.*, 317 F.3d 1390.

13

appropriate subject of a *Daubert* motion. At this junction, the Court will not exclude expert testimony simply because Baxter disagrees with the results stated by Dr. Rubinfeld. *DSU Medical Corp. v. JMS Co., Ltd.*, 296 F. Supp. 2d 1140, 1156 (N.D. Cal. 2003). The threshold issue of admissibility only requires the Court to examine the connection between the opinion proffered and the reconstructed market data. *Id.* Where, as here, there is a sufficient connection, the opinion is admissible with its weight to be determined by the fact-finder. *Id.*

## **CONCLUSION**

IT IS HEREBY ORDERED THAT Baxter's Motion to Bar Fresenius' Proffered Damages Expert Professor Rubinfeld [Docket No. 446] is DENIED. However, Dr. Rubinfeld is precluded from testifying at trial that Baxter has "admitted" that it did not lose profits. Further, both parties are precluded from providing testimony with regard to royalties and the use of the 2008K in Fresenius' clinics.

IT IS FURTHER ORDERED THAT Fresenius shall disclose Dr. Rubinfeld's compensation to Baxter no later than seven (7) days of this Order.

IT IS SO ORDERED.

Dated: 5/18/06

SAUNDRA BROWN ARMSTRONG
United States District Judge